FILED
2018 Nov-21 AM 11:08
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JORDAN JACKSON, ET AL, * 5:18-CV-1855-MHH

PLAINTIFFS, *

V. * November 13, 2018

MADISON COUNTY BOARD OF REGISTRARS, ET AL, * 9:30 a.m.

* Birmingham, Alabama

DEFENDANTS.

*****************************************************************

REPORTER'S OFFICIAL TRANSCRIPT OF
HEARING ON MOTION FOR TEMPORARY RESTRAINING ORDER

BEFORE THE HONORABLE MADELINE HUGHES HAIKALA
UNITED STATES DISTRICT JUDGE

COURT REPORTER:

Julie A. Martin, RMR, CRR
Federal Official Court Reporter
1729 Fifth Avenue North, Ste 325
Birmingham, Alabama 35203

* * * * *

A P P E A R A N C E S

* * * * *

FOR THE PLAINTIFFS:

Kerri Johnson Riley (By phone)
KERRI JOHNSON RILEY, P.C.
120 Holmes Avenue, Suite 403
Huntsville, AL 35801

Catherine Meza
Daniel S. Harawa
Kerrel Murray
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th St. NW, Apt. 717
Washington, DC 20005

Samuel Spital (By phone)
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

FOR THE DEFENDANTS:

Misty Shawn Fairbanks Messick
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130-0152

I N D E X

| WITNESSES: | D | C | RD | RC | FRD |
| --- | --- | --- | --- | --- | --- |
| Simeon Sykes | 9 | 12 | 14 | | |
| Johnny Brent Beal | 16 | 40 | 59 | 61 | |
| Lynda Hairston | 68 | 78 | 90 | 92 | 93 |
| Jordan Jackson | 96 | 98 | | | |

* * * * *

P R O C E E D I N G S

* * * * *

THE COURT: We are here this morning in case 18-1855. This is Jackson versus the Madison County Board of Registrars. We are here to resume the TRO hearing that we began last Friday.

So let me go ahead and turn this over to counsel for the plaintiffs. I have reviewed the supplemental affidavits that the plaintiffs placed in the record yesterday evening.

MS. MEZA: Good morning, Your Honor. It's Catherine Meza from the NAACP Legal Defense and Educational Fund on behalf of plaintiffs.

THE COURT: Good morning.

MS. MEZA: Good morning. I just want to take care of one housekeeping thing before we begin. We also filed a motion for pro hac vice admission for my colleague Kerrel Murray and wanted to have a determination on that before we begin, so he can make part of the presentation this morning.

THE COURT: Okay. Have you had a chance to look at it? Did you enter an order on it?

THE CLERK: I haven't yet.

THE COURT: Go ahead and enter an order if it looks like it's in order. And I think with the motions we received last week filing fees -- or the pro hac vice fee hadn't been

submitted for the applications last week. So if you all need to catch up on any of those fees, will you make sure that that's handled, please?

MS. MEZA: Yes, Your Honor, we will.

THE COURT: Okay. Thanks.

MS. MEZA: So I wanted to just review the facts here which are straight forward. Plaintiffs, who are four African-American students at Alabama A&M University, a historically black university, all timely submitted voter registration applications prior to October 22nd, 2018, which was Alabama's registration deadline for the November 6th election.

Despite having timely submitted their voter registration applications, when plaintiffs arrived at their assigned polling place on election day, their names were not on the voter rolls, and they were instructed by poll workers that they would have to cast a provisional ballot.

Since election day, plaintiffs have checked the status of their provisional ballots and discovered that their ballots have been rejected, meaning they will not be counted. By failing to process plaintiffs' timely-submitted voter registration applications, not permitting them to vote a regular ballot and by subsequently not certifying and counting their provisional ballots, defendants have denied these young people the right to vote.

As Your Honor recognized on Friday, the central

dispute in this case is whether plaintiffs' voter registration forms were submitted to the board of registrars prior to October 22nd, and our evidence shows that the answer is yes.

First Terry Matthews, whose declaration is at ECF 4-5, recounted that he registered at a voter registration drive on the A&M campus in mid October. Yet he showed up on election day, and he had to cast a provisional ballot. Mr. Matthews' friend, Lamar Lee, Junior, whose declaration is at ECF 4-8, corroborates Mr. Matthews' story and notes that he and Mr. Matthews registered to vote at the same time. Yet, Mr. Lee was able to cast a regular ballot on election day, and Mr. Matthews was not.

Next, Jordan Jackson. Ms. Jackson submitted her voter registration form at the voter registration drive held in the lobby of her dorm, Foster Dormitory Complex. She submitted her application on October 14th at the same time as her friend Indya Gima. Yet, on election day, Ms. Gima was able to cast a regular ballot, but Ms. Jackson had to cast a provisional ballot. Ms. Jackson's declaration is at ECF 4-4, and her supplemental declaration is at ECF 19-1.

Also, Ms. Kendra Jones. Ms. Kendra Jones completed an online voter registration form during a registration drive hosted by Delta Sigma Theta sorority of which Ms. Jones is a member. Her supplemental declaration includes an email notice she received indicating that the drive took place on October

10th. Yet Ms. Jones had to cast a provisional ballot. Her declaration is at ECF 4-7, and her supplemental declaration is at ECF 19-2.

Then Mr. Simeon Sykes, who registered to vote on October 17th at a voter registration drive held on the A&M campus. Again, he submitted his registration timely, but on election day he had to cast a provisional ballot. Mr. Sykes declaration is at ECF 4-6, and his supplemental declaration is at 19-4.

The facts proferred by plaintiffs are supported and corroborated by Monica Clarke, an A&M administrator, as well as by Virginia Bailey and Cindy Allen, who organized multiple registration drives on the A&M campus.

Ms. Clarke, who is a faculty member and a freshman academy service learning coordinator and acted as the primary contact for voter registration efforts on campus, stated that her office facilitated 30 registration drives between September 16th and October 10th.

Further, approximately 1,100 voter registration applications were collected as a result of those drives and were delivered to the board of registrars. Ms. Clarke regularly delivered these applications herself. Ms. Clarke's affidavit is at ECF 19-3.

Cindy Allen and Virginia Bailey recounted that between October 8th and 22nd they engaged in voter registration

drives at the A&M campus on a weekly basis. Ms. Bailey stated that she frequently submitted voter registration applications to the board of registrars and also often coordinated with Ms. Clarke for her to submit the applications in person to the board of registrars. Ms. Allen's and Ms. Bailey's declarations are at ECF 4-2 and ECF 4-3, and Ms. Bailey's supplemental declaration is at ECF 19-5.

Your Honor, although no party requested that individual plaintiffs be present at today's hearing, we have asked them to stand by and join the conference line if necessary.

We would offer the declarations, the supplemental declarations from plaintiffs Mr. Lee, Ms. Bailey and Ms. Allen and the affidavit of Ms. Clarke as record evidence.

With respect to Mr. Simeon Sykes only, we request the opportunity to present brief live testimony in order to offer additional evidence about a clarification he made in his supplemental declaration. And if that is acceptable to Your Honor, my colleague Kerrel Murray will present Mr. Sykes' testimony.

THE COURT: Sure, that's fine.

MS. MEZA: In sum, we request that Your Honor enter a temporary restraining order and injunction requiring plaintiff -- excuse me -- defendants to accept and count the provisional ballots cast by plaintiffs. Thank you.

THE COURT: Thank you, Ms. Meza. Mr. Murray, we need a minute to get the telephone line connected, please.

(Brief pause)

THE COURT: All right. Mr. Murray.

MR. MURRAY: Your Honor, I believe Mr. Sykes is already on the line, so I'll just call out to him then.

THE COURT: Okay.

SIMEON SYKES, PLAINTIFF, CALLED AS A WITNESS.

DIRECT EXAMINATION

BY MR. MURRAY:

MR. MURRAY: Thank you, Your Honor. Kerrel Murray from the NAACP Legal Defense and Educational Fund on behalf of the plaintiffs.

I believe we have Mr. Simeon Sykes on the line. Mr. Sykes, can you hear us?

A. Yes, sir.

Q. Good morning. How are you doing?

A. I'm doing pretty good. How about yourself?

Q. I'm doing well. Thanks. So we're just going to go through a few questions about your experience registering and voting.

So can you first state your name for the record, please?

A. Simeon William Sykes.

Q. Okay. And are you currently in school at Alabama A&M

University?
A. Yes, sir.
Q. Now, did you complete a voter registration application in October of 2018?
A. Yes, sir.
Q. Now, you submitted two declarations in this case; correct, a first one and a supplemental declaration?
A. Uh-huh, that's correct.
Q. That's correct. Okay. Could you explain for the Court why it is that your supplemental declaration states that you registered on October 17th as opposed to October 10th and how it is you were able to figure that fact out?
A. For a while, I was trying to make sure my dates was correct. I was going through my email to find when I had a certain meeting that I was actually attending. And once I found out that the meeting was on October 17th, it made me realize that I actually filed on October 17th, on October 17th, 2018.
Q. Great. Now, what meeting was it that you found that lets you know that this happened on October 17th?
A. A Makers Project meeting. It pays for some of my schooling here at Alabama A&M.
Q. So it was a scholarship meeting?
A. Yes, sir.
Q. Okay. And so based on finding that meeting, what about

finding that meeting confirmed for you that you registered on October 17th?

A. So I went to that meeting. I have a lot of classes to go to. So right after that meeting, I actually had a class at 1:00 o'clock. So in between that meeting and my class at 1:00 o'clock, I signed the registration form.

Q. Great. Now, turning actually to when you actually registered, can you tell us where it is on campus that you registered?

A. I registered at the quad as they call it here. It's basically in the middle of campus.

Q. Now, where on the quad did you register? Was it a particular place on the quad or a particular structure?

A. There was a tent, and I went to the tent, and I ended up finding the registration form. It was in the corner of the quad.

Q. Okay. So you filled out the registration form at the tent. Now, once you finished filling out the form, what did you do with it?

A. Once I finished filling out the form, I gave it to the man in front of me, and I went to class.

THE COURT: I'm sorry. Mr. Sykes, could you repeat, you gave it to whom, please?

THE WITNESS: The man right in front of me who was working at the tent, and then I went to class.

THE COURT: Okay. Thank you.

MR. MURRAY: Your Honor, I have no further questions at the moment. But, Mr. Sykes, can you please stay on the line in case the Court or anyone else has any other questions for you.

THE WITNESS: Yes, sir.

MR. MURRAY: Thank you.

THE COURT: Cross-examination.

MS. MESSICK: Thank you, Your Honor. Misty Messick for the defendants. I would like to cross Mr. Sykes, and I'm going to ask that he be sworn before he answers my questions.

THE COURT: Sure.

THE CLERK: Mr. Sykes, I'm about to swear you in, please. Do you swear or affirm that you will speak the truth, the whole truth and nothing but the truth so help you God?

THE WITNESS: Yes, ma'am.

THE CLERK: Thank you.

CROSS-EXAMINATION

BY MS. MESSICK:

Q. Good morning, Mr. Sykes. My name is Misty Messick, and I'm a lawyer for the defendants in this case, and I just wanted to ask you a few questions as well.

What year are you in at school?

A. I'm currently a sophomore.

Q. And before you registered in Alabama, you were registered

in Kentucky; is that right?
A. Yes, ma'am.
Q. When is the last time you voted in Kentucky?
A. This is the actually the first time I voted in general.
Q. So you were registered in Kentucky but never voted there?
A. Yes, ma'am. I originally went to Kentucky.
Q. After you filled out a voter registration form at the quad and gave it to the man in front of you, did you ever check with the Board of Registrars' office in advance of the election to be sure that your form had been received?
A. No, ma'am.
Q. And did you ever check the Secretary of State's website before the election to see if it showed you as a registered voter?
A. No, ma'am.
Q. When you went to the polls on election day, did you fill out a voter registration update form?
A. Can you say that again?
Q. When you went to the polls on election day, did you fill out a voter registration update form?
A. No, ma'am.
Q. All right. Thank you, sir.
A. Thank you.
MR. MURRAY: Your Honor, may I ask a quick redirect question?

THE COURT: Sure.

REDIRECT EXAMINATION

BY MR. MURRAY:

Q. Mr. Sykes, this is Ms. Kerrel Murray again. I just have a couple of follow-up questions for you. When you went to the polls on election day, you were required to fill out a provisional ballot; is that correct?

A. Yes, sir.

Q. Now, when you filed out your provisional ballot, did you also fill out a form that requested from you basic identification information, name, address, and so on?

A. Yes, sir. That was actually on the provisional form as well.

MR. MURRAY: Thank you. No further questions, Your Honor. Mr. Sykes, just please stay on the line unless the Court is satisfied with what we've said so far.

MS. MESSICK: No further questions from the defense, Your Honor.

THE COURT: All right. Mr. Sykes, you answered a number of questions that Mr. Murray asked you, and then you were placed under oath for cross-examination.

Were any of the answers that you provided to Mr. Murray's questions inaccurate, or are there any statements that you made that you would like to correct for the record?

THE WITNESS: No, ma'am.

THE COURT: Okay. How old are you, please?

THE WITNESS: 19.

THE COURT: And as far as you know, you currently are registered to vote in Alabama as of today; is that correct?

THE WITNESS: Yes, ma'am.

THE COURT: Tell me a little bit about what you observed when you went to the tent to vote. Were you the only person, the only student there registering to vote, or were there others there as well?

THE WITNESS: There was one other. I didn't really get a good look at her or him. I was more focused on class at the time, so I signed the papers and made sure it was correct and then went to class.

THE COURT: Okay. You said that you signed papers to register. Was there also an opportunity in the tent to register online, or were they only using paper registration forms in the tent, if you know?

THE WITNESS: It was just paper that I saw.

THE COURT: Okay. All right. Any followup to the Court's questions?

MR. MURRAY: No thank you, Your Honor.

MS. MESSICK: No, Your Honor.

THE COURT: Mr. Sykes, thank you for being available to speak with us this morning. Have a good day.

THE WITNESS: Thank you, ma'am. You, too.

THE COURT: All right. What else for the plaintiffs?

MS. MEZA: Your Honor, as I noted, we would like to submit all declarations, supplemental declarations and an affidavit from Ms. Clarke for the record as evidence for the record as well as Mr. Sykes' testimony today.

THE COURT: All right. What do the defendants have to say, please?

MS. MESSICK: Your Honor, we would like to call two witnesses here this morning, one in person and then one who is on the phone. And I note that she gave kind of a summary of their position. I think that it would make more sense if we did ours after we put our evidence in.

THE COURT: Sure, however you would like to proceed is fine.

MS. MESSICK: Okay. So I would like to call Brent Beal.

JOHNNY BRENT BEAL, DEFENDANT'S WITNESS, SWORN.

THE CLERK: If you will state and spell your first and last name for the record.

THE WITNESS: It's Johnny Brent Beal, J-O-H-N-N-Y; Brent, B-R-E-N-T; and Beal, B-E-A-L.

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MS. MESSICK:

Q. Good morning, Mr. Beal.

A. Good morning.
Q. How are you employed?
A. I'm employed as an attorney at the Secretary of State's office.
Q. Are you licensed by the State of Alabama?
A. Yes, ma'am.
Q. Are you familiar with the claims in this lawsuit?
A. Yes, ma'am.
Q. How did you become familiar with those claims?
A. We had -- I had gotten a call I think from local counsel. I think Ms. Kerri Riley, I think if I recall, who had said they were about to file a lawsuit against us, against the Secretary of State's office.
Q. And did you receive and review a copy of that complaint?
A. I did, yes, ma'am.
Q. And was that on Friday, this past Friday?
A. It was Friday or Thursday. I can't remember which day it was. We've been so busy with different election activities. I'm sorry. It all kind of runs together here lately.
Q. Did you investigate the claims made in the complaint to see if the plaintiffs had been registered to vote?
A. Yes, ma'am, I did.
Q. And what did you find?
A. So once I pulled up all four of the individuals in our PowerProfile voter registration system, they were made active

September -- November 7th in our system, and there was no application or anything prior to that. It was just the online system.

And they put in the system that they had used the update form, which is attached to the provisional ballot, that said -- that allows you to update and register there at the polls on election day.

Q. Thank you. You just made a reference to the online system, but you were talking about Power Profile, the state-wide voter registration system?

A. Yes, ma'am. So all the --

Q. Please go ahead and explain.

A. So all of the registrars' offices are tied -- we have a state-wide voter registration system, which we call it -- it's PowerProfile. It's built by ES&S. But all of the information goes into that system, so we can have a central database for all the different counties.

And so you can -- we can log in. Other counties can log in to view. I can't change anything. I only have viewing privileges. And so I can see what activity or what has been scanned in to the system for a particular voter.

Q. And did you look in PowerProfile for the four plaintiffs in this case?

A. I did, yes, ma'am.

Q. Did you gather any other information from any other source

on these plaintiffs?
A. No, not from those four as far as -- well, I did get -- because of this, I reached out to local board of registrars and asked them as far as for more information, saying how did they get in the system as far as registered on the 7th, because I just wanted to find out how that it happened.
And so they had provided me with some of the documents they had filled out on election day, a provisional ballot and the update form, because those weren't scanned into our system yet. And so I wanted to see those and see exactly why they would have done it, taken a particular action.
MS. MESSICK: Your Honor, may I approach both the witness and the bench with Defendant's Exhibit 1?
THE COURT: You need to show it to plaintiffs' counsel first, please.
MS. MESSICK: And may I approach?
THE COURT: Yes, ma'am.
MS. MESSICK: Thank you, Your Honor.
Q. Mr. Beal, I've just handed you what I've labeled as Defendant's Exhibit 1. Do you recognize these documents?
A. Yes, ma'am. This is what was sent to me from the board of registrars.
Q. The first page is what was sent to you?
A. Well, they sent me all three of these printouts. The first page was the provisional verification statement, which

just lists the reason why the person was voting a provisional ballot. And then the second page is a re-identification or update form, which we do -- you do with every provisional ballot. And so this is for Mr. Terry Matthews, III.

And then the third page is a screen shot of what one would see in our PowerProfile system for the registrant details of Terry Matthews, III. And so in the bottom, you will see that they have checked -- I don't know if you can tell from this picture, but this is the activity screen. And on the date, you'll see 11 -- November 7th at 9:40 a.m. Mr. Matthews is put in as a new registrant, and there's no prior history prior to that.

So if they had received anything and done anything on Mr. Matthews, it would have shown in the history of that voter PowerProfile system.

Q. And the second page of Exhibit 1, that document is labeled voter re-identification/update form. But is that the form that was then used to register him anew?

A. Yes, ma'am, that's correct.

Q. And you said this is a form that is used with the provisional ballot?

A. Yes, ma'am. And if you see on the top part of the form, it actually says for use with a provisional ballot. This would not have been something that they would have filled out prior to the election.

Q. And what is the date that Mr. Matthews has signed this?
A. It's marked November 6th, 2018.
Q. And is that day of the most recent general election here in Alabama.
A. Yes, ma'am.
Q. Mr. Matthews said in his affidavit that he had registered in mid October at the same time that his friend Lamar Lee, Junior, had registered. Did you look for Mr. Lamar Lee, Junior's voter registration records?
A. Yes, ma'am, I did.
Q. Giving a copy to plaintiffs' counsel to look at while I mark the others.
MS. MESSICK: Your Honor, may I approach the witness and the bench?
THE COURT: Yes, ma'am.
Q. Mr. Beal, I've just handed you Defendant's Exhibit 2. Can you tell me what this document is?
A. Yes, ma'am. The first page is the -- one of the tabs is an attachment tab. And so on the bottom right is the bottom part of Mr. Lee's application that he would have filled out. That one is dated August 28th of 2018.
Q. I'm sorry, Mr. Beal, is this also from PowerProfile?
A. Yes, ma'am. I'm sorry. This is all from our PowerProfile system, and this is a screen shot.
Q. And you were saying the -- the bottom right-hand corner,

that's part of the voter registration form?
A. Yes, ma'am. And so that would show -- that's Mr. Lee's signature and date purports to be in the system. And if you -- it looks like it was -- on the second page, you'll see the activity, which you would see that he was made a new registrant on September 5th, but it was put in as suspense because Mr. Lee's birthday is September 20th. So he did not turn 18 until September 20th.
So the system is designed -- you can actually register six months prior to turning 18. And so on your 18th birthday, you're automatically made active. So he was made active on 9/20, but they actually received the form and put it in the system on September 5th.
Q. So his application was dated last -- late August?
A. Yes, ma'am.
Q. He went into the system in early September in a suspense status and became an active voter once he became 18?
A. Yes, ma'am, that's correct.
Q. And all of that, according to these records, happened before mid October when he says that he registered again?
A. That's correct, yes, ma'am. We have no -- there's nothing in the system that says we received another one in October.
Q. I would ask you to look -- it looks like it's on both pages. There's a box that says federal data, and it tells you the source of the voter registration form. What is listed for

Mr. Lee?

A. Yes, ma'am. It says from voter drives.

Q. And does this document also reflect the race that he has self reported?

A. Yes, ma'am, it does.

Q. And what race has he self reported?

A. It is marked as black.

Q. Thank you.

MS. MESSICK: I'm handing plaintiffs what I propose to mark as Defendant's Exhibit 3, which is for plaintiff Jordan Jackson.

Your Honor, may I approach the bench and the witness?

THE COURT: Just one minute, please. Let me ask a quick question, please, about the information concerning Mr. Lee, which is in Defendant's Exhibit Number 2.

On the second page, Mr. Beal, under the activity type column, on September 20th, there's information about a mailing address change. Can you tell from this form how that information was provided?

THE WITNESS: Yes, ma'am. That would be -- it's redacted here, but if I recall, I remember it was a -- the address that Mr. Lee has, and actually I had a hard time finding him, because he was under Lamer Lee. And I spelled it as L-A-M-A-R as opposed to L-A-M-E-R, which is in here. So he had the general address for the university.

And my understanding is, from looking at it, that they just clarified and added a little bit on there so he could get mail, so it would be a better mailing address.

THE COURT: So that was just done internally; that wasn't a form that Mr. Lee submitted as far as you know?

THE WITNESS: No, ma'am. It was just done as -- they're used to dealing with mail at Alabama A&M University, so they're familiar with that address.

THE COURT: And then the entry on September 25th, it says notice sent. Do you know what that notice would have been?

THE WITNESS: Yes, ma'am.

THE COURT: It says ID card. What would that be, please?

THE WITNESS: Yes, ma'am. So that would be just the typical voter registration card that one would get that lets you know which district you're in and those types things to --

THE COURT: Where to go vote?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Thanks.

MS. MESSICK: Your Honor, may I approach with Defendant's Exhibit Number 3?

THE COURT: Yes, ma'am.

MS. MESSICK: Thank you.

Q. Mr. Beal, do you recognize these documents?

A. Yes, ma'am.
Q. And what are they?
A. These are the documents that were attached to Jordan Jackson's provisional ballot. So it's very similar to Mr. Matthews, but this would just be for Jordan Jackson.
Q. And do these documents reflect that Ms. Jackson also filled out a voter's re-identification/update form at the polls on November 6th, 2018?
A. Yes, ma'am.
Q. And what does PowerProfile tell you about when she was registered?
A. It shows November 7th, 2018.
Q. And in the federal data section, does it show a source of the registration?
A. Yes, ma'am. That one actually says polling place.
Q. Can I ask you to turn back for just a minute to Defendant's Exhibit 1, which was for Mr. Matthews, and ask the source of his registration as well?
A. That's polling place.
Q. So Mr. Matthews and Ms. Jackson, according to the voter registration system, were registered based on forms they filled out at the polling place on election day?
A. Yes, ma'am.
Q. Are you aware that Ms. Jackson filed a declaration in this case?

A. I am, yes, ma'am.
Q. And in that declaration -- well, she's filed two. In the first one, she says that her friends, Indya Gima and Brelle Bree Wright registered at the same time that she did.
Did you look up the registration information for those two ladies?
A. I did, yes, ma'am.
Q. And did you find that they were registered?
A. They were, yes, ma'am.
Q. And what race are they?
A. I would have to look -- it's my understanding, if my memory is correct, they were both listed as black in the system.
MS. MESSICK: Giving the plaintiffs what I have marked as Defendant's Exhibit 4 and give them an opportunity to review it.
Your Honor, may I approach the bench and witness please?
THE COURT: Yes.
MS. MESSICK: Thank you.
Q. Mr. Beal, can you tell me what Defendant's Exhibit 4 is, please?
A. Yes, ma'am. This is the same -- the provisional verification statement, the same as Mr. Terry Matthews and Jordan Jackson, but this is for Simeon Sykes.

Q. And as with the others, this shows a voter re-identification and update form dated November 6th, 2018?

A. Yes, ma'am. The update form is listed as November 6th being signed, and then in PowerProfile, it looks like a new registrant on November 7th, and it was listed under federal data polling place.

Q. Thank you.

MS. MESSICK: Our last plaintiff is Kendra Jones, and I have just given plaintiffs a copy of Defendant's Exhibit 5 to review.

Your Honor, may I approach the bench and the witness please?

THE COURT: Yes.

Q. Mr. Beal, what are these documents, Defendant's Exhibit 5?

A. Yes, ma'am. This is a original verification statement, the same as Simeon Sykes, Jordan Jackson and Terry Matthews, but this was for Kendra Jones.

Q. And the first two pages here relate to the provisional ballot?

A. Yes, ma'am.

Q. And whether it's counted. And the third page is that voter identification update form; is that right?

A. That's correct. It was dated November 6th of 2018 and signed.

Q. And you have two pages of PowerProfile information for

her. Can you tell us when was Ms. Jones originally registered to vote?

A. Yes, ma'am. It looks like -- I don't think this shows me when she was first registered in Mobile as far as the date. It looks like, if I like at the other -- it shows June 27th of 2016 for the Mobile, in Mobile County she was registered.

Q. And how did they -- what is the source in the federal data box for that first page of PowerProfile?

A. The electronic online portal.

Q. And that's the Secretary of State's website?

A. Yes, ma'am. We've got a website where folks can registers through Alabamavotes.gov or we also have an app. They would be listed the same whether they came through the app or whether they came through our website. But either way, it would still be the online portal.

Q. And we'll come back and talk about that. But if I understand you correctly, she was first registered in June 2016 through that online portal in Mobile County, Alabama?

A. Yes, ma'am.

Q. And like the other plaintiffs, did she then register at the polling place on election day last week?

A. Yes, ma'am. And then that would be -- the last page shows in Madison County where she was made a new registrant on November 7th of 2018. And the source for federal data, it says polling place.

Q. The line above new registrant, the second line from the bottom of the last page of this exhibit, it said identified as duplicate. What's going on there, if you know?
A. Yes, ma'am. So the number that you can't really make out, it looks like 673870166 under change to where it says link to, that would be where it was linked to the Mobile one on the previous page, because sometimes things get put in as duplicates, and so it's important to tie two records together. And so that's what they did. That's what that was doing.
Q. She can't be simultaneously registered in Mobile County and Madison County; correct?
A. No, ma'am. So the way it works is our board of registrars for each county, they only have the ability to work on and change records for, say, Madison County, if you're Madison County, and the Mobile County Board of Registrars do Mobile. And so you have to be registered in that county. So you actually move that record to Madison County.
Q. And as a result, she's no longer registered in Mobile County?
A. That is correct, yes, ma'am.
MS. MESSICK: Your Honor, I would move for the admission of these five exhibits.
MR. HARAWA: No objection.
THE COURT: They're admitted.
Q. Thank you. How long has the Secretary of State's office

had an online portal for voter registration?

A. Somewhere in 2016. I don't know the exact date, but somewhere around 2016 we went live with the online voter registration.

Q. And is that an initiative of Secretary Merrill?

A. Yes, ma'am. Voter registration is something he believes in and wants to get more folks registered. And so we've looked at it. And one of the things I think we've talked about internally in the offices is how it's so much easier to do it online.

And so I know when I updated to move to Montgomery, I used the online system as well. And I know that we've used somewhere over -- the last time I checked it was over 600,000 folks had utilized the online voter registration system. So I know that it has been utilized very heavily just because it's so much easier.

Q. Are you aware of the system, the online portal, either the website or the app, going down at any time in October 2018?

A. No, ma'am. That would have been a very critical time where we would certainly -- we would have known. And we've had no indications of it being down at all.

Usually, when something like our website goes down in any way, we get a lot of calls, because folks want to be registered, and they want to make sure their information is up to date. So if something like that goes down, usually, it

lights up every number on my line, so, yes, ma'am.
Q. When you say something like that, the Secretary of State's website has various information for voters; right?
A. It does, yes, ma'am. You can check your polling place. You can check -- similar to the card that we send out, you can actually check which district you're in. Probably the most utilized function is to check your polling place. There are a lot of visitors for that.
Q. Plaintiffs have provided copies of documents showing whether provisional ballots were counted. Is that something that's looked up on the Secretary of State's website?
A. Yes, ma'am.
Q. And they've also provided copies of documents showing whether voter status was active or otherwise. Is that also something on the Secretary of State's website?
A. Yes, ma'am.
Q. And so when you said that if anything on that website goes down, you're not implying that the online voter registration form has ever gone down; correct?
A. No, ma'am. It's -- I think since I've been there, I think we had an issue for like an hour a couple of years ago where it went down, and we got a lot of calls. That was like over two years ago.
Q. When somebody uses the online portal, can you kind of walk us through that? We don't have an Elmo to put it up there on a

laptop, but could you tell us what information they need and what the process is that they go through?

A. Yes, ma'am. So you have to -- to utilize the online system, you have to have a driver's license or a non-driver ID, because we have to have that number to verify, because if you don't, you get a ton of spam and just different things coming in that's unintended. So it's a way to lock it down and have security.

Q. Does that have to be an Alabama license or non-driver ID?

A. Yes, ma'am. For you to do the online voter in our state, it would have to be in Alabama, because we actually have a tie with ALEA where they verify it as you submit the information.

And so it verifies your name, your date of birth and either -- it would be your driver's license number. It doesn't -- your address is not verified. It's just your name and date of birth.

Q. So you need that information to start the process. And then do you essentially fill out the voter registration simply electronically?

A. Yes, ma'am.

Q. It's the same information?

A. Yes, ma'am.

Q. And when you've completed the process, how do you know you're done? Do you have to submit or how do you conclude that process?

A. Yes, ma'am. So when you finish the process, and it actually assigns you a confirmation number. So it will send one to anyone that's done kind of just different online transactions, there's some type of number associated with it. So you get a confirmation number that is actually unique to that exchange of you filling out that form.

And so we can actually go back in -- we use a vendor, Alabama Interactive is our vendor. We use them for all of our business filings and those things. Everything we have in our office utilizing a website comes through Alabama Interactive, but you can go back and track down what exactly happened on that.

Q. And did you investigate whether the online portal showed any evidence that plaintiff Kendra Jones had registered to vote on line in October of 2018?

A. Yes, ma'am. I couldn't find any evidence of that, and I had reached out to our vender Alabama Interactive to do a search for anybody -- for anything related to Kendra Jones, any subset, you know, like Kendra or Jones. And I couldn't -- they couldn't identify anyone.

They identified four other voters that had submitted around that same time period, but they weren't anything close and they weren't in the same county.

Q. Has anybody provided you with a confirmation number from Kendra Jones' online transaction?

A. No, ma'am.
Q. And we've been talking about the Secretary of State's online portal; correct?
A. Yes, ma'am.
Q. Are you aware if other entities offer online registration?
A. I am, yes, ma'am. And I can go into that if you would like me to do that.
Q. Yes.
A. We were made aware, I can't remember the exact date, just a few months ago that Facebook had put a link on their website that says click here to register to vote.

And so curious, as we always are, where does that go, and so we clicked it. And I'm trying to remember whether it went to like a Rock the Vote or Vote.org. It's been a few months. I can't remember where exactly it went, but it did not go to our website.

And so we had contacted Facebook. And we said we would like to have this just redirected to our website to make it, first off, for the privacy of the voter and their information would be secure, but just to make sure there's no different steps. Because every step you add, there could be a chance for something to go missing.

And so we would like the person just to go straight to our website and utilize that and that portal. And they were not willing to do that and did not agree to change that.

Q. Does the Alabama Secretary of State's office consider a registration application received by that office by Alabama election officials when it's provided to a third-party vendor through a website that we don't control?
A. No, ma'am. It would have to be received by our system or the board of registrars.
Q. So if I used some third-party website that third party then needs to give the information to the correct election officials?
A. Yes, ma'am.
Q. And they would need to do it -- the Alabama election officials need to receive it by the registration deadline?
A. Yes, ma'am.
Q. Does Secretary Merrill's office have any role in deciding which provisional ballots count?
A. No, ma'am. We're -- and the code really is just responsible for uniform guidance and election laws. That's pretty much the only thing in the code that allows us. We don't actually evaluate provisional ballots. That's more of a -- it's a county function, and so those are done in the various counties.
Q. Do you know if the Secretary of State certifies the information he receives from the counties?
A. We would certify the state-wide results, and so some of that would be encompassed. I guess some of those ballots would

be turned into votes for candidates, and then those would be put in the results. So we would certify the state-wide and the state candidates.

Q. Has the Alabama Secretary of State's office issued any instruction to any Alabama election official that it should treat black voters and applicants less well than it treats any other voters or applicants?

A. No, ma'am. And even related to that, when it comes to registering on college campuses, Secretary Merrill has sent out various -- the Alabama law requires that the registrars' office go themselves to the various universities around the state.

And then he has encouraged them that around election time you go back and you assist those voters just because we want to have a lot who have folks -- we want to have as many folks registered in our state as we can, and we want to have the information up to date, so we won't have any issues on election day.

Q. Mr. Beal, we talked earlier about Brelle Wright who plaintiff Jordan Jackson says registered at the same time as Plaintiff Jackson.

Do you remember when -- what date PowerProfile shows for when Ms. Wright registered to vote?

A. I don't. I know I brought a print off, but I don't have it here with me.

MS. MESSICK: We have sufficient copies of that. So

I'm going to mark that Defendant's Exhibit 6 and give a copy to the plaintiffs.

Your Honor, may I approach?

THE COURT: Yes, ma'am. Did you say you have one for Ms. Gima as well?

MS. MESSICK: We do not have multiple copies. I believe we have one copy that I could use to refresh his recollection or make the official copy.

THE COURT: Okay.

MS. MESSICK: But somehow we ended up with two sets of Brelle Wright. These things happen with a TRO.

Q. Mr. Beal, can you tell me what Defendant's Exhibit 6 is, please?

A. Yes, ma'am. This is from PowerProfile. The first page would be, again, the attachments that would show the application that was submitted by Brelle Wright.

Q. And on that first page, what is the source of her voter registration application?

A. It's voter drives.

Q. And can you tell from this the date on which she was registered at that voter drive?

A. Yes. The date says August 28th of 2018, but I can't tell if she signed it and put the 18th or the 28th at the bottom, but it was put into the system on August 28th.

Q. So not in October?

A. No, ma'am.
Q. And what race did Ms. Wright self report according to PowerProfile?
A. The system has her marked as black.
MS. MESSICK: Your Honor, this particular copy has not yet been redacted in the way that the others have been. I don't know if you want us to handle that now or do it after the hearing.
THE COURT: Let's do it after the hearing, please.
MS. MESSICK: And then you asked about Indya Gima.
THE COURT: Yes, ma'am.
MS. MESSICK: And I believe we have just one copy of her information and --
THE COURT: Why don't you show it to plaintiffs' counsel, please, and then you can show it to Mr. Beal?
MS. MESSICK: Thank you, Your Honor.
THE COURT: While you're doing that, do you want to offer Defendant's Exhibit 6?
MS. MESSICK: Yes, Your Honor. I would move for its admission.
May I approach the witness?
THE COURT: You may. Is there an objection from plaintiffs to Defendant's Exhibit 6?
MR. HARAWA: No objection, Your Honor.
THE COURT: It's admitted.

Q. Can you tell me what Defendant's Exhibit 7 is?
A. It's a screen shot from PowerProfile. This is the first page. Again, it's the attachments tab. And the second page would be the activity tab.
Q. And on what date does that indicate that Ms. Gima was registered?
A. It shows October 11th of 2018, and her application looks to be signed October 9th of 2018. I think she had wrote November 27th, but it looks like October 9th, 2018.
Q. And does that document -- what race does that document reflect that she self reported?
A. She's marked as black in the system.
MS. MESSICK: Thank you. May I approach the witness?
THE COURT: Yes, ma'am.
MS. MESSICK: Would Your Honor like to see Defendant's Exhibit 7?
THE COURT: We'll make copies of it, and I will review it in a little bit.
MS. MESSICK: All right. I would move for the admission of Defendant's Exhibit 7, please.
MR. HARAWA: No objection, Your Honor.
THE COURT: It's admitted.
MS. MESSICK: And I'm giving this one back to the witness. We have no further questions at this time of this witness.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. HARAWA:

Q. Good morning, Mr. Beal.

A. Good morning.

Q. So you mentioned this system called PowerProfile I believe?

A. Yes, sir.

Q. And that system is maintained by the Secretary of State; is that correct?

A. Yes, sir.

Q. And just to be clear, we reviewed a number of records today, I believe Defense Exhibits 1 through 7. The only information from PowerProfile was the last page with the screen printout; is that correct?

A. I think there were -- right. So, there would be different tabs down below, but the top part remains the same, yes, sir.

Q. And PowerProfile requires the data to be populated from somewhere; is that right?

A. It does.

Q. So, you won't get information from let's say Madison County unless the board of registrars inputs that information; is that correct?

A. Right. As far as information, yes, sir, they have to actually to put it in. The activity tab, that's not populated.

The system automatically assigns that on what day they did the work.

Q. So if nothing -- if the board of registrars for a particular county doesn't input any information, it won't show up in your PowerProfile system; is that accurate?

A. That's correct.

Q. And in the records that you went over with defense counsel, you said you received some of those documents from the board of registrars; is that correct?

A. That's correct.

Q. Would that information also be input into the PowerProfile system?

A. It would. Now, it's my understanding, I don't think the provisional ballot statement gets scanned in or the board of registrars' action. It's usually just the application and the update form that would be scanned in after the election. So I wouldn't have that as of yet. They've been busy doing provisional ballots, so they haven't scanned those in at this point.

Q. So if I understand you correctly, there's at least, as far as these forms go, some lag time in between when the board of registrars received the documents and when it was -- and the time it is uploaded to PowerProfile, I guess?

A. Yes, sir, yes, sir, that's correct.

Q. Do you have the defense exhibits up there with you?

A. I do, yes, sir.
Q. Can we turn to Defense Exhibit 1? So the first page on Defense Exhibit 1, you received that from the board of registrars; is that correct?
A. That's correct.
Q. And would this information be with this form -- I'm sorry, I get confused with all the forms. Would this form be uploaded onto PowerProfile or --
A. No. I've never seen a PB-3 on the form.
Q. Now, if you turn to Page 3 of Defense Exhibit 1. In the table towards the bottom of the page, it says mailing address changed twice. Can you tell me what that notation means?
A. The system keeps track of every change. It was done about a minute apart, so I don't know if they made a typo or they went back and changed it. It keeps track of everything. So once it's in there, it's in there as far as in the history and activity. And so without seeing exactly what was redacted, I can't -- I don't know what exactly they changed.
Q. And so similarly, it says there are three entries from 9:40 to 9:43, and then two entries from 11:47 to 11:48.
Can you explain why there was two separate or seemingly separate entries into Mr. Matthews' log?
A. Right. So looking at this, it looks like the user on the far right was a Brandon Moore who had put Mr. Matthews in as a new registrant. And so all these come together as we've seen

in this. This was all filled out at the same time.

So they would have entered him in as a new registrant. He had a new provisional ballot. And then he went ahead and listed that the provisional ballot was rejected at the exact same time. And then it looks like, I'm guessing, two hours later, it would have gone to Ms. Hairston for her to review.

Q. Okay. Can you turn to Defense Exhibit 3 for me, which I believe is Ms. Jackson's information. Can you turn to the last page of that exhibit?

A. Sure.

Q. So according to your PowerProfile system, Ms. Jackson was also a new registrant, but she does not have similar entries -- or I guess the first three entries are similar, but she does not have the two additional entries that Mr. Matthews has.

Can you explain that difference?

A. Yeah. So you would only get -- the new registrant would entail your address. And then if there was something where someone had to go back and correct something or fix something in the address field, then you would get an additional in the activity log. So it doesn't look like that occurred here.

So that could occur for a variety of reasons, one of which is -- like I said, I can't look at the redacted here to tell you. But as far as the address that they had put in, whether it was put in a different way or the right way, I don't

know the answer to that.

Q. And you also don't know whether Ms. Hairston reviews everybody's provisional ballot as its input to the system? Are you aware of that personally?

A. There are three registrars in Madison County so as a board of registrars. So they would be -- they would have to go through -- so a great example of this would be if we look at Defendant's Exhibit 7, it would have all three signatures of the three members of the board of registrars on there.

Q. I guess just to be -- maybe my question wasn't clear. So it seems as if Ms. Hairston for Mr. Matthews went back into his record and updated his information.

Is that standard practice to your knowledge that Ms. Hairston would review everybody's information and update as necessary?

A. That would be something you would have to ask Ms. Hairston as far as their office practice, as far as how they would go about updating someone's address.

Q. Can you turn to Page 2 of Defendant's Exhibit 3? And this form is for the board of registrars and canvassing board use only, and it states the reason for why the provisional ballot was rejected; is that accurate?

A. Yes, sir.

Q. And you received this from the Madison County Board of Registrars?

A. Yes, sir.
Q. If you turn back to Defense Exhibit 1, there's no similar form for Mr. Matthews; is that correct?
A. That's correct.
Q. And --
A. Not that I received. I don't know if there is one.
Q. And you've relied on the board of registrars to send you all of the information about the plaintiffs in order for you to testify here today; is that correct?
A. Yes, sir.
Q. And you were provided with no explanation for why there's not a similar form in Mr. Matthews' records?
A. I was not. I didn't inquire into that, and we were reviewing -- part of my review was just trying to figure out what date they were registered.
Q. And when you requested forms from the board of registrars, what exactly did you ask for?
A. How they came about to be registered on November 7th was my question.
Q. So you didn't ask for all the information in the board of registrars' possession related to the plaintiffs?
A. Well, I guess my question was when were they first registered, how did they become registered on November 7th. And so it was really just a -- and given the time crunch that we were under at the time when I first received these, I think

this was all -- they just gathered as many as they could and then sent me what they quickly could lay their hands on.
Q. And just for the record, if you could quickly review Page 2 of Defendant's Exhibit 4, Defendant's Exhibit 5 and Defendant's Exhibit 6, I believe -- no, sorry.
Defendant's Exhibit 4 and 5. Page 2 of both of those exhibits also has this form detailing why the provisional ballot was rejected. That is missing from Mr. Matthews' records; is that correct?
A. That is correct.
Q. Could we turn to Mr. Sykes' records, which I believe is Defendant's Exhibit Number 4? And so Page 1 of this form, when it says reason for provisional ballot, the box that's checked says the voter has requested but claims to have not voted in an absentee ballot; is that correct? Is that accurate?
A. I can't tell if that's bold in or if that's just a bad copy.
Q. Well, it appears to be darker -- it's shaded more darker than the other boxes in that particular part of the form; is that correct?
A. I would say that's correct, it is. I'm just not sure of the reason. I can't answer that.
Q. And then if you turn to Page 2 of this form, of this exhibit, excuse me, it says the reason why Mr. Sykes' form wasn't counted was because he was not registered in Madison

County; is that correct?
A. That's correct.
Q. And so because you cannot tell whether this box is checked in or not, you cannot explain the discrepancy between those two notations?
A. No, sir. That would be if someone had requested an absentee ballot but had not returned it, and they would mark that one. I can't explain -- and that would have been done on election day at the polling place, and so I can't explain to you why that box is darker.
Q. Okay. And this notation not registered in Madison County -- I'm sorry, strike that.
Can you turn to Defendant's Exhibit 3, Page 2 of that exhibit? And so just to be clear, Defendant's Exhibit 3 is Ms. Jackson's records. So Ms. Jackson's records state that her provisional ballot was rejected because she was not registered at the time of election; is that accurate?
A. That is what it says.
Q. What that states?
A. Yes, sir.
Q. Then when we turn to Defendant's Exhibit 4 for Mr. Sykes, his says his provisional ballot was rejected because he was not registered in Madison County; is that accurate?
A. That is what it states.
Q. Can you explain the difference between those two

notations?
A. Yeah. So it could have been that these were -- whoever wrote that could have been a different person reviewing it, and they could have just said -- really it's just meant to be like notating whether you're registered in Madison County or not registered at the time of election. Really, they're kind of synonymous in the same way. You're not registered in time for the election.
Q. So to be clear, there's no uniform way to fill out these forms?
A. No, sir. This is just more for really just the board of registrars to use. It's kind of their -- if you look on the left, it just says investigative finding and working notes would be on the left, and then they state the reason for counting or not counting the ballot. So it's just really to give them notes to present to the canvassing board.
Q. And are these notes made part of the Power -- I'm sorry, I forget the name of the system -- PowerProfile system?
A. No, sir.
Q. And are these notes relied on by the board of registrars when deciding whether to count a provisional ballot or not?
A. These would be their recommendation to the canvassing board, yes, sir.
Q. And your office, I believe you said, provides training or guidance on elections; is that correct?

A. We're responsible for uniform guidance.

Q. Do you or does your office -- excuse me -- provide guidance on how to fill out this form?

A. I don't recall if we specifically issue training or any guidance on this form as far as the worksheet, I guess you would call it.

Most of your guidance on how to fill out the provisional verification at the poll-worker level would be done by the probate judge as the county election official. But as far as the board of registrars, Ms. Hairston or one of the board of registrars could give you a better answer as to whether there's any training that our office has conducted with her.

Q. And so just so we're clear, so your position is not registered in Madison County is the same as not registered in time for election; is that right?

A. Right.

Q. But you can't be sure because you weren't the person who reviewed these provisional ballots?

A. Well, I guess I'm looking at legally whether you're not registered at the time of the election or not registered in Madison County, you would be treated the same.

Q. But you don't know the reason why the notations are different?

A. I don't.

Q. Okay. If you could turn to Defendant's Exhibit Number 2, please, and this is the registration for Lamar Lee; is that correct?
A. Yes, sir.
Q. And so Lamar Lee shows that he registered at a voting registration drive; is that correct?
A. That's correct.
Q. And under his precinct number, do you know where that precinct corresponds to?
A. I don't. I don't know what that precinct number is.
Q. So if you turn to Defendant's Exhibit Number 1, Page 3. Do Mr. Lee and Mr. Matthews have the same precinct number?
A. It appears to be, yes, sir.
Q. And based on Page 1 of Defendant's Exhibit Number 2, did Mr. Lee submit a paper application?
A. Yes, sir, he did, on August 28th of 2018.
Q. And one final question on Mr. Lee. Mr. Lee, you said his application is dated August 28th; is that accurate?
A. Yes, sir, that's the date it's marked.
Q. But he's not listed as a new registrant until September 5th according to Page 2 of that exhibit?
A. Right. That would have been when they processed it or received the form.
Q. So there's a period of time in between when Mr. Lee signed this application and when it was input into the system, and

you're able to see it on PowerProfile; is that accurate?
A. Yes, sir. I'm not sure where he -- based on this, I don't know who he gave it to or I don't know the answer to that based on the system.
Q. But there's a period of time between those two dates?
A. Yes, sir.
Q. You discussed the fact that the Secretary of State encourages or wants as many people as possible to be registered to vote; is that accurate?
A. Yes, sir.
Q. Did the Secretary of State's office conduct any voter registration drives at Alabama A&M University?
A. I don't -- I don't recall if we did personally. I know that we have been there. I don't know exactly when. I can't answer that right now, but I know that we have gone.
And then we also have the photo ID unit, which I'm not sure if they have been on Alabama A&M's campus, but I do know that the board of registrars has, and we encourage them to do that as well.
Q. Well, the board of registrars is required to host a registration drive by Alabama law; is that accurate?
A. Correct. And we've asked them to go above that and go back, yes, sir.
Q. And to your knowledge, did they go above and beyond that?
A. It's my understanding, yes, sir.

Q. And how many times to your knowledge did the Madison County Board of Registrars go to Alabama A&M University's campus?
A. I don't have an answer to that.
Q. Could we you turn to Ms. Jones' registration information, which is Defendant's Exhibit 5. Can you please turn to the second to last page?
So on October 2nd, 2018, it says registration -- registrant district change. Can you explain that notation?
THE WITNESS: October 2nd, I'm not -- without looking at the system, without looking at more information, I can't give you more information, because I'm looking at her previous one from 2017, and all the districts look to be the same that I can see.
So I can't answer the questions as far as what changed. It could be just one line item somewhere down the line that would have been changed, and it could have been just a -- it could have been a board of education race in Mobile that got changed. I don't know the answer to that.
Q. Okay. And then if you look at the entry for February 24th, 2018, and if you go to the previous values. Do you see 4900 Meridian Street? Do you see that address?
A. Yes, sir.
Q. And are you aware that that's the address for Alabama A&M University?

A. I am aware that's the address, yes, sir.
Q. Do you know why that would be under her registration records?
A. Not unless it was -- because it looks like it was changed to the 2572 Nicholas Drive, so -- or it could have been -- I don't know why it was changed to 2572 without looking at it.
Q. Okay. Thank you.
THE COURT: Mr. Harawa, where was that address change in this exhibit? I'm sorry. I'm having trouble finding it.
MR. MURRAY: Yes, ma'am. It's Page 4, Defendant's Exhibit --
THE COURT: I see it. Okay. It's the fourth line down in previous values?
MR. HARAWA: Yes, ma'am.
THE COURT: Okay. Got it. Thanks.
Q. You testified there was some link between the Secretary of State's online portal, and I believe you said the ALEA portal. Can you explain what ALEA is?
A. Yeah, sorry. I shouldn't use an abbreviation without saying what it was. The Alabama Law Enforcement Agency.
Q. And what does that portal do?
A. So it just verifies the person. And when you submit your information, then it looks up your information as far as your driver's license information as well.
And so we've also tied it to whenever you renew your

driver's license, if you put down an address on your driver's license, you can go ahead and opt in and say I would like to go ahead and register to vote here just to make it seamless.
Q. Okay. And are you aware that the ALEA website crashed a couple of times in the month leading up to the election?
A. I am aware that it did. And we reached out to ALEA just to verify and make sure that nothing from our end was affected.
Q. And who is the vendor for the ALEA website if you know?
A. I don't know their vendor.
Q. And are you aware of whether the website crashing could have been impacted information submitted to the Secretary of State?
A. Information that I've gotten that's been presented to me -- I'm not an IT guy. I'm not a technical guy. I can promise you that. But it did not affect our system. It just affected theirs. So you couldn't renew your driver's license through the website, but you could still utilize our system.
Q. And is it accurate to say that somebody could also register to vote at an ALEA location?
A. They could. If they went in -- I guess I was mentioning that as far as -- and part of me was thinking that may be -- it got myself thinking as far as how it would end up in Nicholas Drive. We get a lot of calls where students may want to be registered to Alabama A&M University, but the driver's license will show their home address is Mobile.

So when they go update the driver's license, they'll update that as well. So that gets sent in electronically, and so it updates them to their home address back in Mobile as opposed to Alabama A&M University as far as voting there. So I can't say that's what happened here, but there wouldn't be anything scanned in with that because it's all electronic just like our online portal.

Q. So you can't say for certain whether the ALEA website crashing potentially impacted people who tried to register online?

A. Yeah. The information I've gotten, it would not, it did not, and you would not get a confirmation number because that would be all tied together as well.

Q. And you mentioned on direct examination that there were links on Facebook to a third-party website; is that correct?

A. Correct.

Q. Did your office ever attempt to educate the voters on the fact that they can only register through certain websites?

MS. MESSICK: Objection, misstates the law.

THE COURT: It's a question of fact. It's not a question of law. It's a question, did you do this.

MS. MESSICK: Okay, but he's asking if the Secretary of State's office has ever misinformed voters.

THE COURT: No. That's not the question. Overruled. Go ahead.

A. Can you ask it again? I'm sorry.
Q. I'm sorry. So once you learned this Facebook link was sending potential registrants to third-party websites, did the Secretary of State's office make any effort to inform voters of this and tell them where, in fact, they needed to register?
A. Right. We encouraged folks to go to our Alabama Votes website. That's our only website that we run except we have the app, but it's kind of tied together. And so we encourage folks to go there.
We do various press releases. Whenever the secretary speaks somewhere, he will encourage them to use the app or the online. We encourage them to go there.
Q. But just did your office ever take any specific steps to inform voters that they can only -- that they should be aware of third-party websites, and they should only vote on the Secretary of State's website?
A. Yeah. I don't know that we've -- I don't recall if we did a press release or not related to that exact -- as far as that it may be sending you to a third-party website.
One of the things I don't think we want to do is encourage people not to utilize either a person in a tent on a quad or -- you know, we want people to be registered. So we just want the information to get there.
So I don't know that we've told people not to use third parties or third-party websites because we want as many

people to be registered as we can.
Q. So just so I understand, so there are some websites -- strike that.
Does the Secretary of State accept voter registrations from any other websites than the Secretary of State's official website?
A. No, sir. You would have to have some -- those would have to be -- there's no link between our system and any third-party website, so those would have to be mailed in.
Q. And is that a policy that the Secretary of State has enacted?
A. Well, we've never tied our system to any third-party vendors for security purposes. So it's been or policy not to link third-party websites to our website, because that would be risking linking the voter registration system with a third-party website, which we have no control over their security features. It could open us to certain negative consequences.
Q. Just so I understand, so there's nothing or is there anything, I guess is the question, in the Alabama code or in the regulations that prohibits the Secretary of State's office from collecting registration forms from third-party websites to your knowledge?
A. I can't -- I don't recall.
MR. HARAWA: May I approach the witness, Your Honor?

THE COURT: Yes.
Q. May I look at Defendant's Exhibit 7 again? I'm sorry.
A. Yes.
Q. Defendant's Exhibit 7 is the registration information for Ms. Indya Gima; is that correct?
A. That's correct.
Q. And according to Ms. Jackson's original and supplemental declarations, she registered at the same time as Ms. Gima. Is that your understanding?
A. That's my understanding. That's what her affidavit said, yes, sir.
Q. What date is Ms. Gima's registration on the form?
A. It's dated October 9th, and it looks like a new registrant was added October 11th.
Q. And where or what is the source of her registration?
A. It says voter drives.
Q. And where is her precinct location?
A. It would be the same one as those other two.
Q. And just for the record, so that is the same as Mr. Matthews and Mr. Lee?
A. I would presume they would all have the precinct. It's all registered at the same addresses, yes, sir.
MR. HARAWA: Brief indulgence, Your Honor.
(Brief pause)
MR. HARAWA: No further questions. Thank you,

Mr. Beal.

THE WITNESS: Thank you, sir.

MS. MESSICK: Your Honor, I'm acutely aware of the time. I'm going to be brief, but I do need to ask him just a few more questions, and we do have a second witness who we believe is on the line.

REDIRECT EXAMINATION

BY MS. MESSICK:

Q. Mr. Beal, with one of the exhibits, you saw that there was a period of time between when the voter application was signed and when it was input into the voter registration system.

Is it true that some of that time may be delay in between when the voter signs the form and when the registrars receive it?

A. Yes, ma'am.

Q. I could take a stack of voter registration forms and set up on the corner downstairs and encourage people to register to vote, couldn't I?

A. Sure you could.

Q. And if people filled out those forms with me, it would then be incumbent on me to get that information to an actual local election official or state election official; correct?

A. Yes, ma'am.

Q. It's not really any different with the online system, is it?

A. Not if you go to a third party.
Q. A third party.
A. No, ma'am.
Q. Right. Those are not Alabama election officials?
A. That's right.
Q. You're relying on a third party to get that information to the right government officials?
A. That's correct. We don't have any control over those individuals.
Q. Have you ever had complaints about voter registration drives in terms of forms not coming in?
A. Yes, ma'am.
Q. Can you generally and briefly describe the nature of those complaints?
A. It's usually the standard they will call and say, I'm not showing up on your website; can you tell me why I'm not showing up on your website; I had registered at a voter drive somewhere.
And it could be a lot of different places. A lot of folks do voter drives, and those are good, but they just don't show up. And so usually at that point, it's if before the deadline, I will go ahead and walk them through the online system. And we go ahead and do that with them on the phone and just to make sure that their system -- that they get registered.

Q. So when a voter fills out an application at a voter registration drive, they're not registered at that time? They're not registered until the registrars receive and approve the application?
A. Correct, yes, ma'am.
Q. Do you know by statute how often voter registrars are required to go to the colleges and universities?
A. I'm trying off the top of my head, I don't remember. I know it's in the -- if I recall, I think it's in the fall at the start of their term of every year, but they may have to go twice. I know that we've encouraged them to go more.
MS. MESSICK: Thank you. I don't have any further questions for this witness. I do have another witness.
MR. HARAWA: May I ask two brief questions, Your Honor?
THE COURT: You may, and I have a couple of questions.

RECROSS-EXAMINATION

BY MR. HARAWA:
Q. I'm sorry, Mr. Beal. I told you I was done. So you just said that anybody could set up shop and encourage people to vote and collect their registration applications.
Are you -- or to your knowledge do you know of anybody who can just show up at Alabama A&M's college campus and set up shop and collect registration applications?

A. I'm sorry. Can you ask that again?

Q. To your knowledge, can anybody just show up on campus and collect registration applications at A&M University?

A. Yeah. I'm not sure of Alabama A&M's policies. I know that if I were a student there I could certainly take another application from you or anybody, but I don't know the answer to that as far as their university policy.

Q. And you said you've received complaints about voter registration drives in the past; is that accurate?

A. Yes, sir. All over Alabama, not just at Alabama A&M.

Q. To your knowledge, were any of them at Alabama A&M University this past election season?

A. I don't recall specifically, apparently other than these four, yes, sir.

MR. HARAWA: Thank you. No further questions, Your Honor.

THE COURT: Mr. Beal, a couple of quick questions. Will you look at Defendant's Exhibit 5, please? On the first page in the upper left-hand portion of the document, under ballot style, that form indicates number one. The other provisional verification statements that have been placed in the record all indicate ballot style two.

What is ballot style one, please, if you know?

THE WITNESS: I don't know the answer as far as what would be different on those, and it could just be that the

person filling it out thought that it was a different number. They could have just gotten it wrong. I don't know which one would be correct. I would have to look at the various ballot styles in that precinct.

THE COURT: All right. Then go back to the fourth page, please. You were discussing the address change information earlier. That address change occurred on February 24th, 2018, according to this computer printout; correct?

THE WITNESS: Correct, yes, ma'am.

THE COURT: When there's an address change like that, what ordinarily is the consequence of an address change?

THE WITNESS: That would move your voter registration. So in this case, it was changed to the Nicholas Drive.

THE COURT: Okay. And the Nicholas Drive is the A&M address?

THE WITNESS: No, ma'am. That would be the 4900 Meridian Street Northeast.

THE COURT: All right. I'm having trouble following then. So let's go to the entry before that. So registrant part change, what does that indicated, please?

THE WITNESS: Yes, ma'am. It looks like for some reason she was moved from -- I can't tell if that's 28.3 or 20. -- I think it's 28.3. That would just be a different area of that county, that she would be in a different precinct.

THE COURT: And which county is that?

THE WITNESS: It looks like the jurisdiction would have stayed in Mobile.

THE COURT: All right. And then we go up to the line with the address change to Meridian Street?

THE WITNESS: Yes, ma'am.

THE COURT: And it changed from Nicholas Drive to Meridian street?

THE WITNESS: Well, the only thing I see, Your Honor, is the --

THE COURT: I'm sorry, change from Meridian to Nicholas.

THE WITNESS: Yes, Your Honor.

THE COURT: And that is in which county?

THE WITNESS: I would have to look. I'm not sure what city Nicholas Drive is in, Your Honor, to answer that, but based on it was processed by the Mobile County Board of Registrars, I would guess Mobile, but I'm not as familiar with Mobile to know where Nicholas Drive is.

THE COURT: All right. And then two lines up, what is post voting credit change mean, please?

THE WITNESS: It means she had voted in the primary, so that was the primary, the June primary 2018. So it says '18 and then 06, so that would signify that she voted in the primary in June.

THE COURT: Okay. Then the next line up, the registrant district change, you said you don't understand that because those numbers are the same numbers as the numbers that appear a couple of lines down?

THE WITNESS: The only thing that does change, it looks like the last one I can see is like CS, a lot of zeros, and it could have just been they shortened that to 03. I just don't have -- that column keeps going, and the printout just does not capture that. But for her to participate in the June primary, she would have to have voted in Mobile.

THE COURT: All right. And then on the following page, do you know why Ms. Jones identified as a new registrant in the bottom entry?

THE WITNESS: It could be just because they were putting this in, and they just missed that she was already registered in Mobile. And instead of pulling that record from Mobile to Madison County, they created her as a new and then they --

THE COURT: Well, how can that be if the reason for rejecting her ballot is that she was registered in another county according to the second page of Defendant's Exhibit 5?

THE WITNESS: Because I think they had moved her -- it looks like they moved her, Your Honor, on November 7th. So on November 6th, she would have still been registered in Mobile.

THE COURT: Yeah, but your explanation for why she is listed as a new registrant is that they didn't know that she was registered in Mobile. So I'm trying to reconcile that statement with Page 2 of the exhibit.

THE WITNESS: That I can't really answer, Your Honor, as far as why they did it a certain way as far as putting it in the system, yes, ma'am.

THE COURT: Then in Ms. Clarke's declaration, she says that she was a poll watcher on November 6th, and she observed students who were listed as active on Alabamavotes.gov, but when they checked in with poll workers they were listed as inactive.

Have you had complaints about that happening in the past?

THE WITNESS: If they -- now, if they were listed as active in the system, depending on when they would have ran the poll list for that day or -- my understanding is they might have used poll pads, little I Pads that have a list on there in that county. Then that would have been the date they would have been listed as inactive, but inactive would not have made a voter be required to vote a provisional ballot.

If they do an update, they get to vote a regular ballot on election day. They're not a provisional process. Inactive means you're still registered in that county. It just means that you need to do an update just to make sure your

address is correct.

THE COURT: Okay. All right. Any further questions?

MS. MESSICK: No, Your Honor, not for this witness.

MR. HARAWA: Just one brief question, Your Honor.

THE COURT: Okay.

RECROSS-EXAMINATION CONT'D

BY MR. HARAWA:

Q. Regarding Ms. Jones' information, which is Defendant's Exhibit 5, so the reason on Page 2 it says her ballot was rejected because she was registered in another county, but on Page 1 it doesn't list a reason for why she was given a provisional ballot.

Can you explain that?

A. Yeah. So when she went to the polls on election day, even if they had the poll pads, they would have only had the county-wide voter registration list. They would not have had the state-wide list. And so they would have just seen that she was not registered in Madison County. They wouldn't have saw that she was registered in Mobile.

Q. So do you know why a person's name does not appear on the list of registered voters isn't checked on that form?

A. I'm not sure.

MR. HARAWA: No further questions, Your Honor.

THE COURT: All right. You may step down, Mr. Beal.

THE WITNESS: Thank you, Your Honor.

MS. MESSICK: Your Honor, the defense would like to call Lynda Hairston who I am very hopeful has been on the phone and is still there?

MS. HAIRSTON: Yes, ma'am.

MS. MESSICK: We're going to be brief because we're running out of time, but I'm going to be asked that you be sworn in, please.

LYNDA HAIRSTON, DEFENDANT'S WITNESS, SWORN.

THE COURT: If you will state and spell your first and last name for record.

THE WITNESS: Okay. Lynda, L-Y-N-D-A; Hairston, H-A-I-R-S-T-O-N.

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MS. MESSICK:

Q. How long have you been at the Madison County -- well, how are you currently employed?

A. I am employed by the Madison County Board of Registrars.

Q. And how long have you been there?

A. Going on my 16th year.

Q. And how many registrars are there in your office?

A. Three.

Q. And do you have other employees in that office as well?

A. Yes, ma'am. I have four full time. And right now during this busy season, we have one part time.

Q. Is that last employee part time or is she full time for the season?
A. She's considered a seasonal employee. We only use them during the election process when we're busy with an election.
Q. Are any of the employees in your office black?
A. Yes, ma'am. I have one lady.
Q. Are you familiar with the allegations in this lawsuit?
A. Yes, ma'am.
Q. Did it keep you up last night?
A. Yes, ma'am.
Q. Have you looked through your files to see if the plaintiffs in this lawsuit had registered to vote before the November 6th election?
A. I have. I have looked at everything I have in the office. I didn't find that any of them had been registered here. I can find that Kendra Jones was registered in Mobile, but not in Madison County.
Q. Thank you. And the voter registration deadline for the last election, when was that deadline?
A. October 22nd.
Q. In what ways do paper voter registration forms reach your office?
A. We get them by mail, and people walk in and fill out a paper copy, or we get them from voter drives. We also get them from DHR, Medicaid, WIC and other agencies like that. Those

are mailed to us.
Q. Then you also receive applications electronically; is that right?
A. Yes, ma'am.
Q. What happened to voter registrations that you received before the October 22nd deadline or that were postmarked as of the October 22nd deadline? What did you do with those in your office?
A. We processed those before the poll list was run, so we make sure everyone was on the list that was eligible to vote.
Q. Were all of those registration forms complete?
A. No, ma'am.
Q. Were incomplete registration forms also added into the PowerProfile system?
A. Yes, ma'am. If they were incomplete, we did make -- we did set up a voter registration form, but they were listed as incomplete in case they went to the polling location, and they would understand why they were not listed as active.
Q. What could cause an application to be incomplete?
A. Several things. They didn't sign the application. They didn't give us their date of birth. They did not give us their driver's license or the last four digits of their social, gave us an invalid address, several things.
Q. And you've checked your files and do not find -- well, have you checked your files for registrations received by

October 22nd or postmarked by October 22nd to see if the plaintiffs had applications within that group?
A. Yes, ma'am. We have checked everything that came in from in the mail after the cutoff date. We have checked everything else that we could find. We even checked to see if they were online, and we failed to register them. We did not find anything on any four of these.
Q. You checked the ones that came in before the deadline as well; right?
A. Yes, ma'am.
Q. And are you confident that every voter registration application that your office received by October 22nd or postmarked October 22nd was entered into the PowerProfile system?
A. Yes, ma'am.
Q. What happened to any voter registration forms that you received after October 22nd that did not have a postmark of October 22nd or earlier?
A. We have those set up in a file. They're alphabetical, and we'll hold those until we finish this election, and then we will start filling those out and sending the people the ID cards when we complete them.
Q. So are those paper files?
A. Yes, ma'am. And we do have some that's online. The ones online, we don't process those. We do them the same way. We

just do them electronically.
Q. But you're going to do that after your through processing the November 6th election?
A. Yes, ma'am.
Q. And have you checked those files to see if any of the four plaintiffs are in them?
A. Yes, ma'am. We've checked them three times just to make sure we didn't miss it.
Q. And have you found any of the plaintiffs in those files?
A. No, ma'am.
Q. You're a named defendant in this case; right?
A. Yes, ma'am.
Q. And you've seen a copy of the complaint?
A. Yes, ma'am.
Q. And you know the names of the plaintiffs that we're dealing with here?
A. Yes, I do.
Q. What happened to people who were not registered to vote before the deadline but showed up to vote at the polling place?
A. They were -- they were not on the list, and they insisted that they vote a provisional ballot. They were allowed to vote a provisional ballot.
Then when they came into our office, the board determines or tries to locate that application to see if there was a mistake made in any way. If we can't find anything in

our office, we have to deny or reject that application.

THE COURT: How many provisional ballots did you have to go through for the November 6th election please, Ms. Hairston?

THE WITNESS: I believe we had 1,003.

THE COURT: Thank you.

Q. And as part of the provisional ballot process, are persons requested to fill out a voter re-identification or update form?

A. Yes, ma'am. And once they fill out that, we -- okay. Go ahead. That's it.

Yes, they have to fill out the affirmation statement, which is at the top and then the update form is at the bottom.

Q. And is that updated form then treated as a voter registration application?

A. Yes, ma'am.

Q. So have you heard Mr. Beal testify that all four plaintiffs are now active voters based on registration at the polls?

A. Yes, ma'am.

Q. And is that consistent with your understanding of what happened for these four plaintiffs?

A. Yes. What we do to get them on the provisional ballot list that we have to report to the canvassing board with, we go ahead and reject their application, but we put them on there so we'll have a record that they voted a provisional ballot.

And then we register them after the election date, because they were not registered prior to the election. That's why they come up with a November 7th date.

Q. So if somebody came into your office this morning with a voter registration form, they haven't been processed yet, but the people who filled out the provisional paperwork and the update at the polls, they had to be processed in order to put them into the system to be able to report out whether that provisional ballot should be counted or not?

A. Exactly.

Q. Were you listening during the discussion with respect to Plaintiff Matthews that there's a form missing from the packet that we have, the page that says what the recommendation of the board of registrars is?

A. Right. According to this -- I have the original -- he was not registered in Madison County at the time of the election. So he did not qualify to be counted. He was not registered in Madison County, same note that was on the others.

Q. And you do have that form? We just don't have it here, but it does exist, and you have it this morning?

A. Yes, ma'am.

Q. Do you ever hear complaints from voters who say that they registered through a voter registration drive and then found themselves not registered at the polls?

A. Yes, ma'am.

Q. When voter registration drive organizers bring a stack of applications to you, do you track at that time each individual voter whose application has been submitted?
A. No, ma'am. What we do, we have whoever brings them in sign a sheet just telling us how many applications that came in. Normally, when these voter drives are being conducted, we are quite busy and we do not have the time to verify every name.
Q. In your experience with -- how long have you been at the Madison County Board of Registrars?
A. I'm going into my 16th year.
Q. And in your experience, do the organizers of voter registration drives ever withhold certain voter registration applications?
A. I can't say what they're doing, but I do know that we don't get all of them.
Q. Do you know which -- do you know why?
A. No, ma'am, I don't.
Q. Have you ever known a voter drive organizer to withhold document applications that were incomplete?
A. I have no proof of that.
Q. If somebody registers to vote using Alabamavotes.gov, the on line portal that Mr. Beal discussed, does that information come to you electronically?
A. Yes, ma'am.

Q. And are you familiar with other websites that are not run by the state that offer people an opportunity to register online?

A. I was not made aware of that until just recently. We had several people call and said they registered at some of the websites that are not connected to the Alabama system. So I don't know anything about those really.

Q. Has there been some sort of issue with A&M registrations involving mail? If you know, can you tell me what it is?

A. What are you referring to, the mail returning?

Q. Yes, ma'am.

A. Yes, ma'am, it has.

Q. And what is the problem?

A. We visited A&M, the United States Post Office out there. If the students have a post office box on campus, their mail is delivered to the post office.

It's my understanding talking with the postmaster and the gentleman that handles the mailing for the students that anything than does not have a post office box goes to the student center, and the students are required to pick up their mail at that location.

The postal guy there, if they don't pick up their cards, he says he has no other recourse but to send them back to us. Evidently, the students do not have a mail box at their dorms, and they pick them up at one central location.

Q. When you receive that mail back, do you take any action in the PowerProfile system?
A. Yes, ma'am. We have to place them on an inactive, because if they don't accept their mail, we treat them just like we do anyone else that's returned by the post office. They go inactive. That does not stop them from voting. They just have to go and reaffirm that that is their address.
Q. So they don't vote a provisional ballot, they vote a regular ballot?
A. Yes, ma'am.
Q. They just fill out an extra form to update their registration?
A. That is correct.
Q. Do you know how many people you registered to vote in October of 2018?
A. Wow, I would have to run a report. That would be hard to determine because we get a lot of applications that are just changing addresses. So it's not new applications necessarily.
Q. Do you know --
A. So I can't --
Q. I'm sorry, go ahead. I didn't mean to interrupt.
A. It's hard to give you a total on that because I can run you how many I have new applicants, but that's not all that we processed.
Q. Can you tell me how many registered voters Madison County

has approximately?
A. Approximately 267,000.
Q. And we talked about voters falling into three categories; those whose applications were timely received; those whose applications were untimely received and haven't been acted on yet; and those who showed up at the polls to vote but were not registered and cast provisional ballots.
Which group do the plaintiffs in this case fall into?
A. They were not registered in Madison County by the deadline.
Q. And you've said that you checked -- that every single timely application for Madison County has been entered into PowerProfile; correct?
A. Yes, ma'am.
Q. And you've checked the untimely applications that haven't been processed and found the plaintiffs are not there; correct?
A. Correct.
MS. MESSICK: I have no further questions. The Court and/or the plaintiffs may have questions. If you'll sit tight for a minute.
THE WITNESS: Thank you.

CROSS-EXAMINATION

BY MR. HARAWA:
Q. Thank you, Your Honor. Good morning, Ms. Hairston.
A. Good morning.

Q. Can you explain how -- what is the procedure when you receive an online application? How do you then process that application such that it's in the secretary's database?
A. I'm sorry, I didn't understand that last statement.
Q. How does your office go about processing online voter registration applications?
A. We would process them basically like we would a paper copy. We just pull them up and if they're not registered and they give us the right information, we go ahead and register them at that time.
If we find that a person is registered in another county in Alabama, we can transfer that voter over to Madison County and register him here.
Q. And so if you -- would a registrant be in the PowerProfile system, an online registrant be in the PowerProfile system -- I'm sorry, let me rephrase.
Is your office -- is it true that your office needs to process an online application in order for it to be uploaded onto the PowerProfile system?
A. Yes, sir.
Q. Okay. And so, Ms. Hairston, you were talking about there are 267,000 thousand registered voters, and you couldn't put an exact number on the new registrants.
Do you know approximately how many forms your office received this October?

A. I have no idea. We don't track the mail. We do have the people that bring in voter drives, and I could kind of give you a guestimate on that, but I'm not sure. I would have to work on that.
Q. Do you mind providing a guestimate for the Court?
A. I'm sorry?
Q. Did you mind providing a guestimate for the Court?
A. I would probably say 2 or 3,000. I don't know.
Q. And so when a person who is bringing in applications from a board of registration drive and comes in with a stack of applications, what happens next?
A. Well, we take those applications, and we stamp them the date we receive them, and then we start processing them as we get to them.
Q. And so do you stamp every single application that you receive with a date?
A. Yes, sir.
Q. And you say you process them as you get to them --
A. Well, we take them -- we kind of take them in line, whoever comes first. I mean, you know, it's just we try to keep them by dates and do them as they come in.
Q. Okay. But so is it the case that you do not necessarily process the application the same day you receive it?
A. Oh, no, sir. Especially during the busy times when we have several thousand waiting, we can't possibly do that.

Q. Do you know roughly how long it takes you to process an application that you receive during the busy time?
A. No, sir. I will tell you this: If they come in on the 22nd, we work day and night to get them done. They have to be done before the probate judge runs a poll list.
Q. And as you have the applications that are waiting to be processed, where do you store them?
A. We have a container out here that we keep them in right on the counter.
Q. So they're just -- I'm sorry. So this container is in the office on the counter where people come in and out? Is that --
A. No, sir. It is -- no, sir. It is away from the public. The public is not allowed to see those, no.
Q. But is the container locked?
A. I'm sorry?
Q. Is that container locked?
A. No, it is not locked.
Q. And does the same person receive applications everyday at the board of registrars office?
A. No, sir. All staff members are allowed to accept applications.
Q. So you don't have any -- or I'm sorry. Do you have any firsthand personal knowledge of what each staff member does with every single application that they receive?
A. Normally, if it's a voter drive, a big stack, they will

bring it to the board of registrars, and we stamp those in and put those up for the staff to start processing them.
Q. And so those applications are not put in the container that you're referring to?
A. They are, they are, after we stamp them. The board likes to look at the voter drives when they come in.
Q. Is there a reason why the board likes to take a look at the voter drives and not the other applications?
A. We look at most of the applications that come in. We approve all the applications. Our staff will enter them in, and then the board verifies them. And once we sign off, then we scan those applications into the system.
Q. Okay. You mentioned on your direct examination that you now have the form for Mr. Matthews?
A. I do have his form, the one that was attached to the provisional ballot.
Q. Do you know why that wasn't sent with the rest of his records?
A. It was sent -- it was sent -- it is the bottom attachment to the PB-3, which is the provisional ballot. The PB-3, the provisional verification statement is a two-part form. Those are connected together.
When they fill out the provisional ballot at the polling location, they fill out the affirmation statement at the top, and they also fill out the voter re-identification

update form. That's what we use to register him to vote, and he will be registered here.

Even though he wasn't registered in Madison County by October 22nd, this update form allows us to go ahead and register him for the -- for any election after this election.

Q. I understand. I guess my question is do you know why counsel for the defendant did not receive the form that listed why Mr. Matthews' ballot was rejected?

A. I do not. It could have been just an oversight that it didn't get copied. I don't know, but I can certainly get you one.

Q. Ms. Hairston, what do you do with the paper application forms that have been rejected?

A. We keep them in a file. Then when we get to the point we send them a letter explaining why their application was rejected, and then also they have an opportunity to mail in a new form and get that corrected.

We send them another application, a blank one, and we mark them on the copy of the one -- we keep the original. We send them a copy, mark what they failed to do, and they have the opportunity to go ahead and correct it so we can get them registered.

Q. And you just said -- I believe you said when you get to that point to send them that information, how long does it take you usually to send a registrant information about why their

registration was deficient?
A. If it's not during an election, we do them pretty much every day, what comes in daily. But during a time when we're getting thousands of these things, we might have -- it might take us a little longer to get them done.
And we have been instructed to process the ones that are completed, and then we will work on getting those not -- I mean the ones that are not complete.
Q. Okay. I'm sorry, go ahead. I'm sorry.
A. We're mailing out letters all the time.
Q. I'm sorry. It's hard with the phone. I can't see your face.
A. Okay.
Q. Are you still in the process of mailing out applications for forms that you received prior to the October 22nd deadline?
A. Yes, sir.
Q. I believe you testified that you keep a log of people who turn in applications and the date and how many applications?
A. Yes, I do, uh-huh.
Q. Have you had a chance to review that log in preparation for your testimony today?
A. We did. We looked at it this morning.
Q. Do you have any entries for Monica Clarke on your log?
A. I do.
Q. Do you have any entries -- I'm sorry, go ahead.

A. I was going to look. We're trying to write these down.
Q. Do you have those dates handy?
A. I didn't write down the dates. I just scanned over them to see if I had that name on here, and I did have the name.
Q. And are there multiple entries for Ms. Clarke in that log?
A. Probably, maybe -- I'm just glancing at it. I didn't write how many. I just see her name here a couple of times. One, yeah.
Q. And is Virginia Bailey's name in that log?
A. It is. I see Virginia Bailey now. I'm looking right at her. Yes, I see a couple from her, and there's several sheets of this, so it's kind of hard for me to look over and tell you how many.
Q. Okay. Do you see Cindy Allen's name at all in the log?
A. I know who Cindy Allen is. I believe she's -- if she's the lady with the League of Women Voters. I do see that. I do see her name one time here. I'm not going say that's all. She brought them in for WAVE, W-A-V-E, but she could have brought them in for other people. I don't know.
Q. Ms. Hairston, you mentioned you have one seasonal employee. Approximately when did that employee start working for your office?
A. She's been working with us for several years. She retired, and she does this -- she started working here this year about two or three months before the election process

started.
Q. So would that be -- I'm sorry, I'm just trying to work out -- do you have a rough or approximate month that would have been?
A. I'm just -- I'm not sure. I would have to look at her personnel file and see what day we hired her.
Q. And this seasonal employee would also be collecting registration forms and inputting them into the system?
A. Normally, she doesn't collect. We just let her enter them in the system, and then we recheck them.
Q. Okay. Ms. Hairston, did the Madison County Board of Registrars do any voter drives on A&M's campus this year?
A. Yes, sir, we did.
Q. Do you know the dates of those drives?
A. Not offhand. One of the other -- we kind of divide our work out. And one of the other registrars did that, and I'm not sure of the dates, but we do have -- we sent all the information to the Secretary of State when we do those voter drives.
Q. Do you know who staffed the voter drive for your office?
A. I know that Ms. Thompson, who is a board member, and I know one time she took one of the gentleman from our office and the other time, I believe, one of the ladies went.
Q. So you don't know off the top of your head how many applications were collected during those voter drives?

A. I think they told me that the last time she went 12 or 15 was all we got.
Q. And Ms. Hairston you mentioned earlier that I believe you said you received 1,003 provisional ballots in Madison County; is that accurate?
A. Yes, sir.
Q. Do you know how many of those were from the A&M precinct?
A. If I guessed, I would say roughly 160, something like that.
Q. To your knowledge, is that -- is the number of provisional ballots cast this election higher than in previous elections?
A. I think so.
Q. And I'm sorry, Ms. Hairston, can you just in detail explain the places that you searched to look for the plaintiffs' registration applications?
A. Okay. We went back and checked to see if we had entered an application into the system and failed to see it. We did not. We went back, and we checked on the ones that were not complete. They were set up alphabetically. We went through those twice or three times to make sure we didn't have it there.
Then we went into the applications that we received after October 22nd. There was none of them there. Then we even put in the names in the electronic system to see if one came in electronically after the cutoff date. None of the

names appeared.

Q. Okay. And so are there separate places in your office where different kinds of paper applications are listed or stored? So, for example, are rejected applications stored somewhere different than applications that are processed versus applications that have been accepted and processed?

A. We keep everything that we have -- that's not eligible together and everything that came in after the deadlines separate. We always handle those separately.

THE COURT: Ms. Hairston, with respect to people who register online, I believe your testimony is that your office has to input all of that data for the individual to actually be registered; is that correct?

THE WITNESS: No, ma'am. When we accept it, it comes -- all the information comes over automatically to our system. We have to verify that we don't have another registrant by that name or it's registered in another county. Once we accept that application, it is filled out completely on our system.

THE COURT: Okay. If someone is attempting to register online and they, for example, fail to complete one of the fields of information that is requested in the online application, do you receive any information that shows you that that individual tried to register and do you reach out to that individual the same way you reach out to individuals who submit paper applications that are incomplete?

THE WITNESS: I don't believe that, if it is not complete, they will not get a confirmation number.

THE COURT: And you won't know that they tried to register but were unsuccessful?

THE WITNESS: No, ma'am, I do not know that.

THE COURT: All right.

MR. HARAWA: No further questions, Your Honor.

THE COURT: Do you know, Ms. Hairston, what ballot style number one is?

THE WITNESS: I do not. Ballot styles are assigned by the probate judge.

THE COURT: Okay.

MS. MESSICK: Judge Haikala, it's my understanding that the ballot styles relate to which candidates are on the ballot. So like you could have different lines in a county for board of education, congress. All these different lines could cut through counties. So that's saying which ballot they could get. And is that correct, Ms. Hairston?

THE WITNESS: That is correct, but that's we call precinct parts. We do handle the precinct parts. We do set up the precinct part, but the probate judge determines the ballot style number.

THE COURT: Okay. Thank you.

MS. MESSICK: And, Your Honor, the plaintiffs' counsel have provided us with unredacted copies of the

plaintiffs' affidavits. And those do show, and I believe they will confirm with me, that one of them at least lives off campus.

MR. HARAWA: That's correct, Your Honor.

REDIRECT EXAMINATION

BY MS. MESSICK:

Q. Ms. Hairston, just briefly, the applications that were timely received from voters, those applications were scanned into PowerProfile?

A. Yes, ma'am.

Q. Do you believe that it is probable that one of the plaintiffs' applications could have gotten stuck to somebody else's application?

A. I do not believe it's possible. And the reason I do not believe that is because one clerk or registrar will enter that application. Someone else checks what the first person entered before a card is mailed. That's twice that ballot has been -- that application is handled.

Then after that, after we get all the information in, we scan that form into their record. That's three times that application is handled. I think one of those three people would find it if it was stuck together.

Q. And that's just your normal process; correct?

A. Yes, ma'am, daily process, uh-huh.

Q. And then for the applications that were received after

October 22nd -- were postmarked after October 22nd, you checked for those -- you checked those more than once to be sure that the plaintiffs' applications were not there?

A. Yes. I believe we went through them three times.

Q. And as -- can you tell me the name of other two registrars in Madison County, please?

A. Yes. Nan, N-A-N, Guyette, G-U-Y-E-T-T-E, and Dolores Thompson.

Q. And how long has Nan Guyette been with the Madison County Board of Registrars?

A. She was an employee in the office for several years before she was appointed a registrar, and I believe she has been here one full term, maybe -- this is her second term. I believe this is going into her second term.

Q. And how long is a term?

A. Four years.

Q. And how long has Ms. Thomas been there?

A. Thompson, T-H-O-M-P-S-O-N. She replaced a lady that left, and she came to work here in February of 2018.

Q. You said if an application comes in at the deadline that you all work day and night to get that done; is that right?

A. Yes, ma'am, and weekends.

Q. And that's because, if it is received or postmarked by the deadline, you have to process it so that they are allowed to vote; correct?

A. Yes, ma'am.
Q. And to your knowledge, is that the reason that the voter registration deadline, voter registration cuts off before the election is to allow time for you to process that?
A. Yes, ma'am.
Q. And you've already told us that, I believe and I'm asking you to confirm this, that every application that was received by October 22nd or postmarked October 22nd or earlier has been processed and put into the PowerProfile system; correct?
A. Yes, ma'am.
MS. MESSICK: I have no further questions of this witness.
MR. HARAWA: Two brief questions, Your Honor.

RECROSS-EXAMINATION

BY MR. HARAWA:
Q. Ms. Hairston, your office --
A. Yes, sir.
Q. Your office works day and night to process all the applications by the October -- or worked day and night to process applications by the October 22nd deadline? That was your testimony?
A. Yes, sir.
Q. Am I correct that you testified earlier that you still have not notified some people whose applications were deficient that their applications were deficient, despite them being

turned in by the deadline?
A. That's true. We still have some out there, yes.
Q. So those particular registrants were not given notice in time to cure the registration and vote in the November 6th election; is that correct?
A. That is correct.
MR. HARAWA: No further questions, Your Honor.
MS. MESSICK: Your Honor, if I might follow up?

FURTHER REDIRECT EXAMINATION

BY MS. MESSICK:
Q. I think it got to be a little bit confusing about that October 22nd deadline.
Does everybody who timely submits an application have to be in the system by the end of the day on October 22nd?
A. No, we have -- there is a time frame when they come in. We have a 14 day cutoff prior to election. So we have to make sure everything that comes in here that's postmarked October 22nd is kept separate. Those have to be entered into the system before the probate judge runs his poll list right prior to the election.
Q. Okay. So it's several days and nights -- there's a period of time where you're working to get everything in; correct?
A. Yes, ma'am, yes, ma'am.
Q. Did you just tell plaintiffs' counsel that there were people who had timely applications processed in PowerProfile

but have not received notice from your office of a problem with their application?
A. That's true. They were entered into PowerProfile that they had an incomplete application, and we're working on those just as fast as we can get the letters out to these people.
Q. Now, the plaintiffs are not in that group; correct?
A. They are not in that group.
Q. If a voter submits an application to register to vote or if a person submits an application, and they haven't heard back from the board of registrars, do they have any ability to check on their registration status themselves?
A. They can call our office. We'll be happy to check it. That's about the only thing I know to tell you.
Q. All right.
A. They could call, and we could tell them if we have processed it. And if it has been entered in our system as an incomplete application, we can tell them that.
Q. So they can reach out to your office?
A. Yes, yes, ma'am.
Q. Are you aware of whether the Secretary of State's office provides that information on its website?
A. I think the only thing that the website shows is if they're active or inactive. If they are not registered, I don't believe it comes up on the system at all.
MS. MESSICK: Thank you, ma'am. No further

questions.

THE COURT: If someone is trying to register to vote, and they submit more than one paper application to try to vote, how would your office handle that please, Ms. Hairston?

THE WITNESS: Okay. What we would do, if they -- say, they registered on October the 5th and they gave us all the information and we register, if they send in a duplicate, we will just mark it as a duplicate and scan it into the system. We'll have both records.

If they have changed their address or anything like that, we update the most recent one that we get.

THE COURT: Okay. With respect to the four plaintiffs in this case, they were registered to vote, meaning that they were qualified to vote within 24 hours of the November 6th, 2018, election. You have their provisional ballots. Why is it that those ballots can't be counted?

THE WITNESS: Because they were not in the office by October 22nd, which is the cutoff date to register for the November 6th election.

THE COURT: Okay. All right. Anything else?

MS. MESSICK: Your Honor, I have no further questions for this witness, but I was hoping to be able to make a wrap-up statement of the kind that the plaintiffs made at the beginning.

THE COURT: All right. Just a minute. Let's work on

evidence first.

MR. HARAWA: No further questions, Your Honor.

THE COURT: Ms. Hairston, thank you for your time. I appreciate it.

THE WITNESS: Thank you.

MR. MURRAY: In order to address a point that was raised during prior testimony, we were hoping that we could present very brief testimony from plaintiff Jordan Jackson who I think is still on the phone.

THE COURT: Okay.

MR. MURRAY: If that is --

THE COURT: We'll see if she's still available.

MR. MURRAY: If not, she can call back in.

THE COURT: She's not on the line. So is there a way for us to contact her?

MR. MURRAY: Yes. I told her to call back.

THE COURT: All right. Thank you. I'll be right back.

(Brief pause)

JORDAN JACKSON, PLAINTIFF, CALLED AS A WITNESS.

MR. MURRAY: Your Honor, Kerrel Murray again for the plaintiffs in this case.

DIRECT EXAMINATION

BY MR. MURRAY:

Q. Are you on the line and able to hear us?

A. Yes, sir.
Q. How are you doing? Thank you so much for your patience and calling back in.
A. I'm doing good. How are you?
Q. Doing well, doing well. Thank you. We just had a couple of very brief clarification questions based on the two declarations you submitted.
A. Yes.
Q. So can you tell us where you registered on campus?
A. I registered downstairs in the Foster Complex lobby.
Q. Okay. Who were you with when you registered?
A. I was with my friend Indya Gima.
Q. And so were you with your friend Bree when you registered?
A. No. I was with her at the voting polls.
Q. Can you repeat the last part, you were with her?
A. At the voting polls on November 6th.
Q. Gotcha. So your supplemental declaration states that you were with Indya. Is it correct that she was the only friend you were with when you registered?
A. Yes.
Q. And can I ask what did the two of you do with the forms that you filled out once you completed filling them out?
A. We handed them to the people at the table.
Q. Okay. Thank you. I have no further questions for you, but just stay on the line in case the judge or opposing counsel

wants to ask you any questions.
THE WITNESS: All right.

CROSS-EXAMINATION

BY MS. MESSICK:
Q. Ms. Jackson, my name is Misty Messick, and I'm counsel for the defendants in this case. And I do want to ask you just a few questions, please.
A. All right.
Q. This is awkward because you're on the phone, but do you have your declaration and your supplemental declaration in front of you?
A. No, ma'am, I do not.
Q. Okay. Are you aware that your original declaration said that your friends Indya Gima and Brelle (Bree) Wright registered at the same time that you did?
A. Yes, and that was corrected in my second declaration.
Q. So it was wrong when you signed it last week?
A. Yes.
Q. And your original declaration, Paragraph 4, says, "I registered to vote on October 14th, 2018, by submitting a paper registration form at a voter drive." Is that correct that that's what the declaration said?
A. I registered the week of October 14th, not October 14th the day.
Q. Well, now your supplemental declaration says the week

preceding October 14th.
A. The week preceding.
Q. So October 14th was a Sunday and you registered the week before?
A. Yes.
Q. But you don't know which day of that week?
A. No.
Q. Did you follow up with the board of registrars to find out if your application had been approved before you went to the polls?
A. No. I checked my status on the Alabamavotes.gov website, and it told me I wasn't in the system. It told me there was no match.
Q. That was before the election?
A. Yes.
Q. Do you know what day before the election?
A. November 5th.
Q. Okay. So it was the very day before. It was Monday, November 5th?
A. Yes.
Q. Did you take any action at that time?
A. When I looked at the rules and regulations, they told me there was nothing I could do because I had to submit it 15 days prior.
Q. In your supplemental declaration that was filed late last

night, you said that there were two or three people working at the registration drive; is that correct?
A. Yes.
Q. And quote, "They took our forms and put it in a stack with other voter registration forms," end quote; is that correct?
A. Yes.
Q. Do you know what happened to the form after it left your custody?
A. No.
MS. MESSICK: No further questions.
MR. MURRAY: We have no further questions, but I just want to ask that Ms. Jackson be sworn just for the record.
THE COURT: Thank you. Would you go ahead and do that, please, Yolonda.
THE CLERK: Ms. Jackson, this is Yolonda Berry, Judge Haikala courtroom deputy clerk, and I need to get you sworn in, please.
THE WITNESS: Okay.
THE CLERK: Do you swear or affirm to speak the truth, the whole truth and nothing but the truth so help you God?
THE WITNESS: I do.
THE CLERK: Thank you. And if you will state your full name for the record.
THE WITNESS: Jordan Nicole Jackson.

THE CLERK: Thank you.

THE COURT: Ms. Jackson, now that you've been sworn, were any of the answers that you gave to the questions that the lawyers asked you inaccurate, or is there anything that you would like the opportunity to change now that you're under oath?

THE WITNESS: No, ma'am.

THE COURT: Okay. Anything else, counsel?

MR. MURRAY: No thank you, Your Honor.

MS. MESSICK: No, Your Honor.

THE COURT: All right. Ms. Jackson, thanks very much for your time.

All right. Do counsel for the plaintiffs have closing remarks they want to make?

MS. MEZA: Yes, Your Honor.

THE COURT: All right. And hold on just one second, Ms. Messick. I know you have remarks that you want to make. I thought you might want to wait until after plaintiffs' counsel made theirs. But since you reserved, if you want to go first, you can go first.

MS. MESSICK: Thank you, Your Honor. If they're going to make further remarks, I will go after them.

THE COURT: Okay.

MS. MEZA: Okay. Thank you, Your Honor, just very briefly. The four provisional ballots in question will not

determine the result of any race from election day. So it's not the outcome of an election that's at stake. Here the fundamental vote to right -- the right to vote is at stake.

Plaintiffs, almost all of whom were first-time voters and excited to cast their first ballot, timely submitted voter registration applications and should have been able to vote by regular ballot on November 6th. Instead, they were required to cast provisional ballots. And if the relief sought here that their ballots be counted is not granted, these young people will be irreparably harmed. They will not be able to have their vote count. Thank you, Your Honor.

MS. MESSICK: Thank you, Your Honor. It seems to the defense that this entire case is based on misunderstanding. The plaintiffs have said that they filled out voter registration applications, and they gave them to third parties with respect to the paper applications.

With respect to Kendra Jones, she tells us in her affidavits that she made the submission online, but she never actually tells us which system she used. The plaintiffs' counsel in their brief say it was the state system, but Ms. Jones does not say that in her sworn testimony, and the complaint is not verified.

So it seems what we have are plaintiffs who believed that they took the necessary steps to register to vote, but that those applications were, in fact, not timely received by

the appropriate election officials.

That being the case, they could not be registered for the election just like anyone else who was untimely or hadn't registered. And those votes are not entitled to be counted.

We understand the fundamental importance of the right to vote, and we understand what it might feel to these voters to believe they have taken the necessary steps and then find out that their vote didn't count.

In fact, I remember voting absentee for college in Massachusetts and thinking that my absentee ballot could be received after the election, but the results had to wait for those ballots to come in. And, in fact, I believe that my ballot did not count. That sometimes happens.

Here, while plaintiffs have put forth evidence that they completed the forms, they do not know that those forms got turned in. And the board of registrars have said that they haven't received them. And it is fundamentally unfair to count those ballots now because they filed a lawsuit and not count the ballots of other people in similar situations.

And I just mentioned Ms. Jones. She says that she registered to vote online. She never tells us which system she used. So we do not have proof in this case that she used the Secretary of State system. You also heard Brent Beal testify that he has not received from anybody the confirmation number that she would have received had she used the Secretary of

State's website. They have not been able to find her in that system, and they have no knowledge that the system -- they have no reason to believe that the system was at any time down.

As to the other plaintiffs, they all submitted paper applications. Jordan Jackson and Terry Matthews both tell us they registered at the same time as friends, and that those friends were registered and they weren't. In each case, the friends were black.

Now, that matters because the plaintiffs are alleging that there's some kind of malfeasance at work here, and that they've been denied because they're black. It also matters because those friends appear to also be students at the school, and the plaintiffs have alleged that they have been denied apparently based on voting age. They've got a 26th Amendment claim, which I've never seen before. They actually never tell us in the complaint how old they are or where they were born, and they never directly allege they were denied based on age, but there's evidence from them that their friends were registered.

Further, with respect to Jordan Jackson, so she tells us that she registered at the same time as Indya Gima, and the documents that we reviewed shows that Indya Gima's application was received through a voter drive at approximately the time that Jordan Jackson said they both registered. And Jordan Jackson says that the documents were put together in a stack.

But the plaintiffs have no evidence of what happened to that stack, that specific stack thereafter.

And, in fact, Monica Clarke has submitted an affidavit that says that she collected a lot of these documents from the drives and that she went through them. And she doesn't say why she went through them or if she took some out or if she was following up with students. She doesn't tell us what happened.

She also does not tell us that she turned in every single one that was collected at the school. She tells us that other people did it. These applications went through various hands, and you heard testimony from the board of registrars that they did not reach the board's hands.

And with respect to Terry Matthews, he said that he had registered at the same time as Lamar Lee, and the records from PowerProfile that we've reviewed with Mr. Beal show that there was no application from Lamar Lee at that time. He was allowed to vote last week because he had applied in August.

Now, he may very well have applied in October as well and at the same time as Terry Matthews, but the board of registrars has no record of having received those applications.

We don't know what happened to them. What we know is that the board of registrars didn't receive them. And if they didn't receive them, they couldn't act on them.

And I've already expressed why that means these

voters couldn't be registered, and that it would be unfair to other people who weren't registered in time if these votes were counted when theirs were not.

I also want to make clear that that really is the state interest and the public interest here when you're weighing the four factors of the TRO. It's not about the burden of counting these four ballots. It's about integrity of the system. It's about the fact that there is a voter registration deadline that needs to be met, that that deadline applies to everyone, that that deadline allows time for the registrars to process the applications.

And it's about the fact that people do have the ability to follow up on their registration in a timely manner. I believe that everybody claimed to have registered no later than October 17th. So there was time to follow up before the October 22nd deadline.

And, of course, there was nothing -- I think that there have been times in history when voter registration might be open only for short periods of time. That is not the case. Voter registration was open all year except for when it's shut down for an election. And actually the board of registrars continues to accept applications. They just don't process them.

By the same token, there have been times in the past where people are required to re-register all the time, and that

is also not the case. These plaintiffs could have registered months ago, and they did register -- they say that they filled out the forms in time that they could have followed up and made sure that their applications were valid.

Separate from the issue of just whether they were timely -- the applications were timely submitted, which we believe the evidence shows they were not and that undermines all of their claims, I think it would be remiss if I didn't point out that the complaint does not allege that Secretary of State Merrill has caused any injury to these plaintiffs or that he can take action redressing any injury.

It sounds like it's already been cleared up possibly at the TRO phone call on Friday, but there are suggestions in the complaint about a TRO request that you should be entering some sort of class relief. You don't have a class before you. You just have four plaintiffs.

And I would also point out that the board of registrars has allegedly been sued but it, in fact, has sovereign immunity.

And, you know, there's some other testimony in here that came in late last night, like Virginia Bailey saying there's all kinds of problems with the A&M band applications. We don't have any details about any of that. We don't know who those voters are. We don't know if they are or are not registered. We don't know if their forms were incomplete for

some respect.

I understand that she said that she helped people complete them, but all we know is that she helps people complete them a lot. We don't know how well she does that. She hasn't been here to test any of that.

You know, they've thrown out these ideas that there were these other problems that went on. But these four plaintiffs, it's about that they say they registered, but their application did not get to the board of registrars before the October 22nd deadline or postmarked by that day.

As a result, they were not registered in Madison County on election day. And they, thereafter, showed up as active after the election because that is part of processing the provisional ballots. Their applications at the polls were accepted. And that action happened before this lawsuit was filed.

So, I think that that counters the idea that these particular people are being singled out on account of race or age. When the registrars had the applications, they registered them. So we would ask that the TRO that's already been entered be lifted, and that no further injunctive orders be entered. Thank you.

THE COURT: The Court lifted the TRO last Friday except for with respect to these four plaintiffs. So there has been no restriction on any defendant except for the brief

period of time that there was a restriction on Friday.

MS. MESSICK: Yes, Your Honor, but there is currently, as I understand it, a TRO as to the four plaintiffs, and the deadline for the certification has passed. And it's my understanding that election officials in Madison County have not performed their statutory duties with respect to this election and those four votes because of the limited TRO that is still in place. So that was my reference.

THE COURT: All right. The Court has carefully considered the evidence that has been presented in this case, and what we have here amounts to essentially a chain of custody issue. The plaintiffs have offered credible evidence that they did, in fact, register in advance -- well, they completed the information that they needed to submit to register in advance of the October 22nd deadline.

The defendants have presented evidence that demonstrates that they did not receive that information. So there seems to be some breakdown in between the completion of the forms and the transmission of those forms to the registrars' office with respect to three of the plaintiffs.

As for Ms. Jones who says that she registered online, apparently, there was some issue with respect to that online registration, because we learned on Friday that there should be some sort of confirmation number provided when an individual registers online; but although the Court has received

supplemental evidence today, the Court has not received supplemental evidence that indicates that Ms. Jones received that confirmation number.

And Ms. Hairston' testimony is that if there was an incomplete online application, the registrars' office does not receive that information and cannot process an incomplete online application the same way the registrar's office processes a paper application that's incomplete.

So based on all of the evidence that the Court has received, the Court cannot say at this point that there is a substantial likelihood of success on the merits. So the Court is going to withdraw the TRO with respect to these four plaintiffs.

The Court takes to heart, Ms. Meza, what you said. These are young voters who should be enthusiastic about their right to vote, who made every effort to register to vote and wanted to vote. They wanted their votes to be counted. They cast provisional ballots, and those provisional ballots have been rejected.

So the Court certainly understands their concern and their frustration, and the Court hopes that the attention that it has paid to their claims persuades them that their effort was not without -- without reason or without -- was not met without enthusiasm in an effort to make sure that, if they had been able to establish that their applications were received

and processed, that those votes would have been counted. Because if the evidence were there, those votes would be counted by order of this Court.

I don't think anyone should feel frustration at young people trying to make sure that their votes get counted. It means extra work, but that's extra work that all of us should willingly undertake because every vote counts, and every young voter should feel like they are welcome and that they are part of the process, so that they aren't discouraged from voting in the future.

So I think we were all happy to undertake this effort on behalf of the students. And if the students wish to press forward with their case and see if there's anything else that they want to pursue in this litigation, we will move forward, and I will hear any motions any party has to present to the Court.

Just based on what I've heard, for what it's worth, when Ms. Jackson or somebody else participates -- helps students with a voter drive, it sounds like it might be worthwhile to make a list of all the students who submitted the application forms, so that if something like this were to happen again in the future, Ms. Jackson or somebody else who is part of the drive has some paperwork that could be offered to a judge to help establish that that individual was among -- excuse me -- the application for that individual was among the

applications that were, in fact, submitted to the registrars office.

Is there anything else for the plaintiffs today?

MS. MEZA: No, Your Honor. Thank you very much.

THE COURT: Anything else for the defendants?

MS. MESSICK: No, Your Honor, thank you.

THE COURT: Thank you all very much for your hard work and time today. I think we need to get a copy of Exhibit 7, please. So if Yolonda can work with you please to get that, that would be great.

MS. MESSICK: Thank you, Your Honor. We were also going to handle the redaction now, I thought.

THE COURT: I'm sorry?

MS. MESSICK: I think we were also going to handle redaction now for Exhibit 6 and 7.

THE COURT: Sure, sure.

MS. MESSICK: We will work with Yolonda and the plaintiffs on that.

THE COURT: Very good. Thank you.

(Court adjourned.)

**C E R T I F I C A T E**

**I hereby certify that the foregoing transcript in the above-styled cause is true and correct.**

**Date: 11/21/2018**

**Julie A. Martin, RMR, CRR**

**Federal Official Court Reporter**